**Pedro Rodriguez FERNANDEZ, Petitioner,**

v.

**George C. WILKINSON, Respondent.**

No. 80–3183.

United States District Court, D. Kansas.

Dec. 31, 1980.

Henri J. Watson, Dennis D. Goodden, Kansas City, Mo., Timothy J. Carmody, Olathe, Kan., for petitioner.

William E. Metcalf, Pittsburg, Kan., Roger L. McCollister, Topeka, Kan., for amicus curiae Kansas Legal Services, Inc.

Robert S. Streepy, Asst. U. S. Atty., Topeka, Kan., for respondent.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

Pedro Rodriguez, currently detained at the United States Penitentiary, Leavenworth, Kansas, having paid the necessary fee, has filed with the Clerk of the Court, this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. A rule to show cause issued, respondent has filed an answer and return, and petitioner has filed his traverse. Kansas Legal Services, Inc., submitted an *Amicus Curiae* brief in behalf of petitioner. An evidentiary hearing was conducted and oral argument was heard by the Court from counsel for both parties and the *Amicus* attorney. Having heard the evidence, examined the pleadings and considered all legal arguments and authorities offered, the Court makes the following factual and legal findings.

The material facts are found by the Court to be as follows:

1. Petitioner is a native and a citizen of Cuba who was incarcerated in a Cuban prison at the time he was given the opportunity to come to the United States.

2. He was transported to this country by boat along with approximately 130,000 Cuban nationals who arrived at Key West, Florida, on or about June 2, 1980, seeking admission to this country.

3. Completion of inspection of petitioner was deferred, and petitioner was temporarily removed into the United States in accordance with 8 U.S.C. § 1223.

4. During the deferred primary interview on June 14, 1980, petitioner admitted in a sworn statement that he had been arrested and convicted of crimes in Cuba and that he had been imprisoned there prior to his arrival. The crimes and circumstances of those crimes admitted to were: theft of a suitcase in 1959 for which he was sentenced to and served two years in the Santa Clara Prison; theft of a suitcase in 1964 for which he was sentenced to eight years to serve in Francequita Prison, three years of which he served before he escaped; attempted burglary in 1973 for which he was sentenced to four years in Francequita Prison. A three-year sentence was attached to the latter term as a result of the escape. Petitioner claims that the theft convictions were not of a serious nature because conditions in Cuba force the citizens to steal, and that he did not commit the alleged, attempted burglary. Petitioner testified before this Court that he was convicted by military tribunals. He further stated that he intended to remain in the United States indefinitely and was not in possession of a valid immigration visa.

5. The examining immigration officer determined that petitioner was not "clearly entitled" to land, having admitted conviction of a crime involving moral turpitude, 8 U.S.C. §§ 1225(b), 1182(a)(9), and recommended that he be detained pending an exclusion hearing. This recommendation was concurred in by a panel consisting of three supervisory immigration officials and an agency attorney and approved by the Central Office of the Immigration and Naturalization Service [hereinafter referred to as INS].

6. Petitioner was temporarily removed to a processing camp in Fort McCoy, Wisconsin and, thereafter, on June 16, 1980, was given notice that he was believed to be excludable and would be detained pending a hearing, 8 C.F.R. 235.6 (1980).

7. Petitioner was transferred to the United States Penitentiary, Leavenworth, Kansas, on June 16, 1980.

8. His request for political asylum, which was submitted on June 14, 1980, was denied by the INS District Director at Kansas City, Missouri, on July 14, 1980. This denial is not challenged here.

9. During exclusion proceedings, commencing July 21, 1980, an immigration judge determined that petitioner was excludable from the United States under 8 U.S.C. § 1182(a)(9) in that he admitted having been convicted of a crime involving moral turpitude, and under § 1182(a)(20) in that he was an immigrant not in possession of proper documents. The judge reconsidered and denied petitioner's application for asylum, determined that petitioner should be excluded from entry, and entered an order of deportation. The petitioner waived his statutory right to appeal this decision.

10. The United States Penitentiary at Leavenworth is classified by the Bureau of Prisons as a maximum security institution. Petitioner has been confined in this prison for over half a year. He and approximately 230 other Cuban refugees are presently detained in a dormitory area supposedly separate from the general population of prison inmates, and are designated as on "holdover status." Petitioner testified that conditions in their detention area are more restrictive and privileges are fewer than for general population inmates at the prison.

11. The INS and the Department of State are attempting to make necessary arrangements to return petitioner and the other excluded aliens to Cuba; however, Cuba has either not responded or responded negatively to six diplomatic notes transmitted by the United States. Thus, the Government has been unable to expeditiously carry out the order of deportation and cannot even speculate as to a date of departure. No other country has been contacted about possibly accepting petitioner.

Attorneys for petitioner assert that his continued confinement at Leavenworth without bail and without having been charged with or convicted of a crime in this country is cruel and unusual punishment in contravention of the Eighth Amendment to the United States Constitution, and a violation of the Fifth Amendment Due Process Clause.

■ The claim that excludable aliens who have not gained entry are entitled to the protection afforded by either the Fifth or Eighth Amendments to the United States Constitution was explicitly rejected by this Court in *Mir, et al., v. Wilkinson*, 80–3139 (D.Kan., Sept. 2, 1980, unpublished) *accord: Knauff v. Shaughnessy*, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950); *Petition of Cahill*, 447 F.2d 1343 (2d Cir. 1971). As has been observed by the United States Supreme Court, "... [t]he Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 477 n. 5, 97 L.Ed. 576 (1953) *citing Bridges v. Wixon*, 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103 (1945 concurring opinion). In *Kwong Hai Chew v. Colding*, the Court referred to "excludable aliens" as not within the protection of the Fifth Amendment, 344 U.S. at 600, 73 S.Ct. at 479. While we have never disagreed with petitioner's counsel that alien entrants to this country are extended certain rights under the United States Constitution, we have repeatedly emphasized the distinctiveness of the Cuban aliens detained pending exclusion. This case concerns a member of the relatively small subset of excludable and excluded aliens who, due to a time-honored legal fiction, are not recognized under the law as having entered our borders. Consequently, these nonentrants customarily have not enjoyed the panoply of rights guaranteed to citizens and alien entrants by our Constitution. This disparate treatment has been reaffirmed in *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed. 683 (1972); *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *Pierre v. United States*, 547 F.2d 1281 (5th Cir. 1977), *vacated and remanded for consideration of mootness* 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447. We have been presented with no persuasive authority which would permit us to disregard this well-established precedent.

As a corollary argument, petitioner urges that the potency of this legal fiction proportionally diminishes as the time which an excludable alien is detained in a federal institution within our territorial borders is extended. This argument is enticing, particularly in light of the legal anomaly that certain constitutional rights attach to aliens who manage to secretly and nefariously enter this country but not to aliens who seek entry unavailingly through lawful process. Dicta from one opinion of the Supreme Court may even be read to support this argument:

"The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights...."

*Johnson v. Eisentrager*, 339 U.S. 763, 770, 70 S.Ct. 936, 939, 94 L.Ed. 1255, (1950).

The Court further commented:

in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act.

*Id.* at 771, 70 S.Ct. at 940.

However, the substance of this argument has been rejected with regard to "parole" of aliens into this country or "temporary harborage ashore," *See Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1957); *Shaughnessy v. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); 8 U.S.C. §§ 1182(a)(5), 1223(a), and the argument would seem to be stronger in the case of conditional release than detention. In short, this Court is unwilling to initiate the corrosion of this venerable legal doctrine by holding that the force of the fiction diminishes over time. Nor do we find such a holding requisite to a fair determination of the instant petition.

■ It has long been recognized that the power to expel or exclude aliens is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control. *Fial-*

lo v. Bell, supra; Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954); Harisiades v. Shaughnessy, 342 U.S. 580, 588–589, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952); Shaughnessy v. Mezei, supra, 345 U.S. at 210, 73 S.Ct. at 628; Knauff v. Shaughnessy, supra; Bassett v. United States Immigration and Naturalization Service, 581 F.2d 1385 (10th Cir. 1978). Recent court decisions have not departed from this long-established rule. See Hampton v. Mow Sun Wong, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976). In fact, "... over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." Fiallo v. Bell, supra, citing Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909). Nevertheless, it has also long been established that the discretionary judgment of a political branch of government is judicially reviewable in federal court on a writ of habeas corpus for abuse of discretion. Kleindienst v. Mandel, supra, 408 U.S. at 764–70, 92 S.Ct. at 2582–85 (1972); Foti v. INS, 375 U.S. 217, 228, 84 S.Ct. 306, 313, 11 L.Ed.2d 281 (1963); Kimm v. Rosenberg, 363 U.S. 405, 80 S.Ct. 1139, 4 L.Ed.2d 1299 (1960); Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1953); Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952); Pierre v. United States, supra, at 1289; Rubinstein v. Brownell, 206 F.2d 449 (D.C.Cir.1953), aff'd 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 (1954); Nukk v. District Director of Immigration, etc., 205 F.2d 242 (2d Cir. 1953); Yaris v. Esperdy, 202 F.2d 109 (2d Cir. 1953); Barber v. Yanish, 196 F.2d 53 (9th Cir. 1952), cert. denied 344 U.S. 817, 73 S.Ct. 12, 97 L.Ed. 636; Potash v. District Director of INS, 169 F.2d 747, 750 (2d Cir. 1948); see also 8 U.S.C. § 1105a(a)(9), (b). The respondent's actions in continuing to detain petitioner has been reviewed on this basis.

The issue presented by the facts of this case is not whether petitioner may be excluded or detained temporarily. Alien convicts have been denied entry to this country since 1875 (Act of March 3, 1875, ch. 141, § 1, 18 Stat. 477), when foreign countries were attempting to use the United States as "a dumping ground for their criminal element." Immigration Commission Report No. 39, S.Doc.No.758, 61st Cong., 2d Sess. 22 (1910). In fact, the admission of convicts was forbidden in the first restrictive immigration legislation. 52 U.S.Cong. & Adm. News 1660. Currently, both exclusion and temporary detention of alien convicts are statutorily sanctioned, see 8 U.S.C. §§ 1182(a), 1182(d)(5), 1225(b), 1227. Temporary detention of aliens applying for admission has long been approved by the United States Supreme Court:

> We think it is clear that detention, or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens is valid. Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character and while arrangements were being made for their deportation.
>
> \* \* \* \* \* \*
>
> So, too, we think it would be plainly competent for Congress to declare the act of an alien in remaining unlawfully within the United States to be an offence, punishable by fine or imprisonment, if such offence were to be established by a judicial trial.

Wong Wing v. United States, 163 U.S. 228, 235, 16 S.Ct. 977, 980, 41 L.Ed. 140 (1896). The issue actually before the Court is whether or not an excluded alien may be detained in a maximum security prison indefinitely awaiting deportation by the INS or the State Department.

We have received and hold as credible the testimony of petitioner's expert witness that not knowing the length of incarceration has a deleterious effect upon a human which exacerbates the other serious problems of "prisonization." We find that extended, indefinite confinement in a federal prison is deleterious to the personal integrity of petitioner and can only be viewed as arbitrary detention. Moreover, it appears that had petitioner remained in the Cuban prison, he might now be eligible for

release. It is the further finding of this Court that indeterminate detention of petitioner in the maximum security facility at Leavenworth is not authorized by law and is an abuse of discretion on the part of the Attorney General and his delegates.

Indeterminate detention of an excludable alien is not authorized by statute or federal regulation. Section 1227 of Title 8, U.S.C., provides that "any alien . . . arriving in the United States who is excluded under this chapter, shall be immediately deported to the country whence he came, . . . unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper." This provision is contained in Part IV of the Immigration and Naturalization Act which governs entry and exclusion of aliens. Unlike the statutes governing deportation, neither § 1227 nor any other provision in this part sets forth procedures to be followed when deportation is not expeditiously accomplished. Sections 236 and 237 of Title 8 of the Code of Federal Regulations, promulgated by the Attorney General to effectuate the statutes relating to the exclusion of aliens and deportation of excluded aliens, do not suggest a course to be followed when detention is extended due to an inability to deport. Section 237.2 of Title 8, C.F.R., provides that an alien who has been finally excluded and "taken into custody either upon notice to surrender or by arrest shall not be deported less than 72 hours thereafter without his consent thereto filed in writing with the district director in charge of the place of his detention."

Respondent suggests that Congress has intentionally failed to amend the immigration laws to include a specific time limitation on detention of excluded aliens similar to that for deportable aliens. It seems more plausible that statutory guidance as to the permissible length of administrative detention of excluded aliens is lacking because the present situation has not been a common occurrence. As early as 1958, the United States Supreme Court noted:

> Physical detention of aliens is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond. See Annual Reports, Im & N Service, 1955, pp. 5–6; 1956, pp. 5–6.

*Leng May Ma v. Barber, supra,* 357 U.S. at 190, 78 S.Ct. at 1075. At the evidentiary hearing in a previous habeas corpus case filed by another Cuban detainee, the INS District Director, George W. Geil, testified that this situation is unique in United States history and that Congress did not foresee such circumstances because alien convicts are normally disallowed entry to this country when they go through pre-processing prior to departing their home land.

Even though § 1227 provides that an excluded alien shall be immediately deported and regulations encourage deportation within 72 hours, petitioner has not been transported to Cuba. Testimony indicates that the State Department has been unable to obtain Cuba's consent to petitioner's return. Thus, petitioner continues to be detained in the Leavenworth maximum security prison, with no indication as to when, if ever, his detention in this country will terminate.

Detention in a jail or prison facility of aliens pending deportation has not been held to be unlawful *per se. Russo v. Thompson,* 188 F.2d 244 (2d Cir. 1951); *Russo v. Thompson,* 172 F.2d 325 (2d Cir. 1949); *Yaris v. Shaughnessy,* 112 F.Supp. 143 (S.D. N.Y.1953). However, whereas early regulations expressly authorized the confinement of an alien in a jail approved by the INS, 8 C.F.R. § 150.5(d) (1944); contemporaneous regulations and statutes no longer specify jails or prisons as an alternative place of detention. 8 U.S.C. § 1252(c); 8 C.F.R. § 235.3(b). Certainly, we do not hold here that an excluded alien may never be administratively detained in a jail or prison facility. On the other hand, the Attorney General is "not given unbridled license to exercise his discretion as to detention in whatever arbitrary or capricious way he might see fit. . . ." *Yaris v. Esperdy, supra.* Indeed, an abuse of discretion has been found in a district director's refusal to release an imprisoned alien awaiting delayed deportation

where the alien had not been charged with a crime. *Lam Tuk Man v. Esperdy*, 280 F.Supp. 303 (S.D.N.Y.1967); *Kordic v. Esperdy*, 279 F.Supp. 880 (S.D.N.Y.1967).

■ Courts have condemned the protracted, administrative confinement of an excluded or deportable alien to accomplish a purpose other than deportation. When the INS is unable to effect deportation with reasonable dispatch, extended administrative detention can be justified as incident to deportation only where an administrative finding has been made that the alien is likely to abscond or is a security risk. *Kusman v. District Director of Immigration, Etc.*, 117 F.Supp. 541 (S.D.N.Y.1953) [hereinafter cited as *Kusman*].

In the case of deportable aliens, detention to accomplish the alien's departure is generally limited by statute to a six-month period. 8 U.S.C. § 1252(c). While this statute refers to "any alien" against whom a final order of deportation is made, so that it might be construed to apply to petitioner, Part V of the Act in which it is contained deals exclusively with deportation. Thus, we cannot limit petitioner's detention directly under § 1252(c). Still, the section does exhibit Congress' disapproval of detention beyond the reasonable time necessary to execute a final order of deportation.

Prior to the enactment of the Internal Security Act of 1950, 8 U.S.C. § 156, Congress had never referred to a specific period for detention of an alien pending efforts to execute the order of deportation. Section 23 of that Act for the first time provided that following the entry of an order of deportation "the Attorney General shall have a period of six months from the date of such order ... to effect the alien's departure from the United States, during which period, at the Attorney General's discretion the alien may be detained...." Section 1252, 8 U.S.C., of the Immigration and Naturalization Act of 1952, the successor and expanded section, contains a similar clause. Even before the passage of these statutory provisions, courts did not hesitate to condemn the detention of an alien whenever it appeared, following the lapse of a reasonable time, that his deportation was impossible or could not be effected in the foreseeable future. *Kusman, supra; Ross v. Wallis*, 279 F. 401 (2d Cir. 1922); *Petition of Brooks*, 5 F.2d 238 (D.Mass.1925); *Caranica v. Nagle*, 28 F.2d 955 (9th Cir. 1928); *Wolck v. Weedin*, 58 F.2d 928 (9th Cir. 1932); *In re Hanoff*, 39 F.Supp. 169 (D.Cal. 1941); *Janavaris v. Nicolls*, 47 F.Supp. 201 (D.Mass.1942). The rationale underlying these decisions was that detention was intended for the sole purpose of effecting deportation. *Kusman, supra; Wong Wing v. United States, supra*, 163 U.S. at 235, 16 S.Ct. at 980. Once it became evident that deportation was not realizable in the foreseeable future, the continued detention of the alien was found to be without cause. *Kusman, supra; Ross v. Wallis, supra*. The courts held that approximately two to four months was a reasonable period to detain an alien pending deportation efforts. *Kusman, supra, and cases cited in note* 10. Congress, perhaps prompted by these judicial determinations, enacted § 23 of the Internal Security Act of 1950 and its successor § 242(c) of the 1952 Act, limiting detention to a period of six months pending efforts to execute a final order of deportation. Any detention beyond this period is "automatically terminated," even though the alien remains subject to the supervision of the Attorney General. *Kusman, supra*, at 545.

■ In a deportation case, in order to sustain his burden of proof that his detention is not for deportation purposes, the alien must show not only that the country of his choice will not accept him but that no country to which he is deportable under the Act will have him, 8 U.S.C. § 1253(a). An exclusion case, as we have here, is dissimilar in that the alien would need only show that the country from which he came will not accept him. This is because 8 U.S.C. § 1227 provides no alternatives for deportation of an excluded alien other than "to the country from whence he came." *See Maldonado-Sandoval v. United States INS*, 518 F.2d 278 (9th Cir. 1975).

Senate Bill 1763, recently introduced by Senator Edward M. Kennedy, would amend the Immigration and Naturalization Act to provide alternatives for deportation in exclusion cases similar to those now applicable in deportation cases under § 1253. Included as a final alternative is "any country which is willing to accept the alien into its territory . . . ." (96th Congress, September 18, 1979). Apparently, this Bill has not yet been acted upon. However, we perceive in this a recognition of the need to facilitate deportation of excluded aliens in an expeditious manner similar to that for deportables. Unfortunately, the proposed modifications to the INA do not include a time limitation on detention of excludable and excluded aliens. We hope that Congress and the Select Commission on Immigration and Refugee Policy will be made aware of and consider this problem.

In the meantime, this Court firmly believes and declares that indeterminate detention in a maximum security prison of excluded aliens who have not been convicted of a crime in this country or found to be a security risk is arbitrary and every bit as objectionable as indefinite detention of deportable aliens.

The Government relies primarily upon *Mezei v. Shaughnessy*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953) [hereinafter cited as *Mezei*], in arguing that petitioner's continued detention is lawful. At first glance, this case appears to be directly on point. In *Mezei* the United States Supreme Court held that the twenty-month detention pending deportation of an excluded alien was not unlawful. The lower court had ordered the alien released on bond, having found his confinement "no longer justifiable as a means of removal elsewhere, thus not authorized by statute, and in violation of due process," *Id.* at 209, 73 S.Ct. at 627. The Supreme Court reversed, holding that exclusion, by means of detention on Ellis Island, was not a deprivation of any statutory or constitutional right. *Mezei* has recently been cited by. this Court for its vital principle that "whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned," *Id.* at

212, 73 S.Ct. at 629, *citing Knauff v. Shaughnessy, supra. Mir, et al v. Wilkinson, supra.* However, the result in *Mezei* does not compel us to declare petitioner's confinement lawful. *Mezei* is distinguishable from the facts of this case in several respects. We do not rest our decision upon a violation of due process. Our petitioner has not been deemed a national security risk, and, most importantly, statutory authority for parole of excluded aliens now exists.

The Supreme Court in *Mezei* concluded its opinion by citing the lack of statutory authority to parole excluded aliens as a basis for its decision:

> It is true that resident aliens temporarily detained pending expeditious consummation of deportation proceedings may be released on bond by the Attorney General whose discretion is subject to judicial review. *Carlson v. Landon*, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 421 (1952). By that procedure aliens uprooted from our midst may rejoin the community until the Government effects their leave. An exclusion proceeding grounded on danger to the national security, however, presents different considerations; neither the rationale nor the statutory authority for such release exists. Ordinarily to admit an alien barred from entry on security grounds nullifies the very purpose of the exclusion proceeding; Congress in 1950 declined to include such authority in the statute.

*Mezei, supra*, 345 U.S. at 215–216, 73 S.Ct. at 630–31.

It was noted by the Court that newer and broader discretion had been granted to the Attorney General in a section of the INA of 1952 providing for parole of excluded aliens, but that the new section was "not now here," *Id.*, at 216, n. 14, 73 S.Ct. at 631 n. 14. The Court also relied upon the Passport Act of 1918 which authorized the imposition of additional restrictions on aliens "during periods of international tension and strife," *Id.*, at 210, 73 S.Ct. at 628. References were made to "the present emergency,"

"times being what they are," and the "Communist conspiratorial technique of infiltration." Unlike thirty years ago when *Mezei* was decided, today the statutory authority to parole an excluded alien does exist, 8 U.S.C. § 1182(d)(5), and the "Communist evil" is not thought to be as imminent. Moreover, there is no indication in this case that petitioner is a threat to national security.[1] For these reasons, we reject the Government's argument that we are constrained by *Mezei* to uphold petitioner's continued confinement.

■ We have declared that indeterminate detention of petitioner in a maximum security prison pending unforeseeable deportation constitutes arbitrary detention. Due to the unique legal status of excluded aliens in this country, it is an evil from which our Constitution and statutory laws afford no protection. Our domestic laws are designed to deter private individuals from harming one another and to protect individuals from abuse by the State. But in the case of unadmitted aliens detained on our soil, but legally deemed to be outside our borders, the machinery of domestic law utterly fails to operate to assure protection.

■ The *Amicus Curiae* in this case contends, and counsel for petitioner urges, that the continued detention of petitioner is in contravention of fundamental human justice as embodied in established principles of international law. Cited as legal authority are *The Universal Declaration of Human Rights*, U.N. Doc. A/801 (1948) and *The American Convention of Human Rights*, 77

Dept. of State Bulletin 28 (July 4, 1977), signed by President Carter on July 1, 1977. We agree that international law secures to petitioner the right to be free of arbitrary detention and that his right is being violated.

Most of what we now recognize as international human rights law has emerged only since 1945, when, with the international implications of Nazi denials of human rights vividly in mind, the nations of the world expressly included as one of the purposes of the new United Nations organization the promotion of human rights and fundamental freedoms. When the second World War ended, "human rights obligations became part and parcel of the peace treaties." Stotzky, Book Review, 11 MIAMI J. INT'L L. 229 Spring 1979 [hereinafter cited as *Stotzky*].

■ International rules are generally binding upon nations only in cases where either: (1) the nation concerned has expressly consented to be bound by such rules, as by ratification of a treaty containing the rules;[2] or (2) where it can be established through evidence of a wide practice by states that a customary rule of international law exists.

The most important source of international law is international treaties. At present, the United States has ratified and is a party to only a few human rights treaties.[3] Petitioner does not assert that his detention is in direct violation of any treaty to which the United States is a party.

---

1. Respondents have never suggested to this Court that any interest implicating national security is latent within the circumstances of this case which might be jeopardized by judicial mandate. This is apparently the first case of record being decided on the issue of imprisoning these Cuban excludables with criminal backgrounds. Yet the State Department and immigration officials have proffered very little information to the Court. From this seeming lack of interest, the Court has deduced that we are faced here, not with a covert threat to national security, but quite simply, with a problematic situation for which the established immigration laws and regulations provide no direct solution and for which Congress and agency officials have failed, through a lack of

either time or inclination, to formulate new, effective policy.

2. For recent listing of U.N. human rights treaties in force and the nations parties to them, see memo by the Secretary-General to the Commission on Human Rights on *Status of Multilateral Treaties on Human Rights Concluded Under the Auspices of the United Nations*, UN Doc E/CN. 4/ 907/ Rev. 13, 27 Jan. 1977.

3. For a listing of human rights treaties to which the United States is a party as of January 1 of each year see *Treaties in Force*, published each year by the United States Department of State.

The development of international agreements containing human rights norms which purport to be binding on the parties was a significant step in the transformation of natural rights into positive legal rights. *Stotzky*, at 235. These arguments are intended to bind nation-states regardless of their own constitutions or other laws. As early as 1798 in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648, court justices displayed a willingness in a proper case to prevent a legislature's intrusion upon private property or contract rights "even if not expressly restrained by the Constitution. . . ."

 The difficulty with international agreements as a legal source is that the courts are simply not bound by these documents unless they have been ratified by the United States. And we are signatory to very few international human rights agreements and ratifying state to even fewer such agreements.

One important document by which the United States is bound is the United Nations Charter. 1970 Yearbook of the U.N. 1001, 59 Stat. 1033 (1945). This document "stands as the symbol of human rights on an international scale." *Stotzky*, at 237. The Charter entered into force on October 24, 1945, and resolves to reaffirm faith in fundamental human rights and in the dignity of the human person. Almost all nations in the world are now parties to the U.N. Charter.

There are a great number of other international declarations, resolutions, and recommendations. While not technically binding, these documents establish broadly recognized standards. The most important of these is the *Universal Declaration of Human Rights*, adopted by the U.N. General Assembly in 1948. Mrs. Franklin D. Roosevelt, as Chairman of the Commission on Human Rights and a representative of the United States, explained the force and effect of the *Declaration* before the General Assembly of the U.N. preceding its final vote:

> In giving our approval to the declaration today, it is of primary importance that we keep clearly in mind the basic character of the document. It is not a treaty; it is not an international agreement. It is not and does not purport to be a statement of law or of legal obligation. It is a declaration of basic principles of human rights and freedoms, to be stamped with the approval of the General Assembly by formal vote of its members, and to serve as a common standard of achievement for all peoples of all nations."

5 Whiteman, Digest of International Law 623 (1965).

Richard Bilder, an international legal scholar, has suggested it may currently be argued that

> standards set by the Universal Declaration of Human Rights, although initially only declaratory and non-binding, have by now, through wide acceptance and recitation by nations as having normative effect, become binding customary law. Whatever may be the weight of this argument, it is certainly true that the Declaration is in practice frequently invoked as if it were legally binding, both by nations and by private individuals and groups.

Bilder, R., The Status of International Human Rights Law: An Overview. 1978 International Law and Practice 1, 8.

It is a jurist's opinion that

> "although the affirmations of the *Declaration* are not binding *qua* international convention within the meaning of Article 38, paragraph 1(a) of the Statute of the Court, they can bind states on the basis of custom within the meaning of the same Article, whether because they constitute a codification of customary law as was said in respect of Article 6 of the Vienna Convention on the Law of Treaties, or because they have acquired the force of custom through a general practice accepted as law, in the words of Article 38, paragraph 1(b), of the Statute."

Separate Opinion of Vice-President Ammoun in Advisory Opinion on the continued presence of South Africa in Namibia (S.W. Africa) 1971 I.C.J. Reports 16, 76. Thus, it

appears that the *Declaration* has evolved into an important source of international human rights law.

Articles 3 and 9 of the *Declaration* provide that "everyone has the right to life, liberty, and the security of person," and that "no one shall be subjected to arbitrary arrest, detention or exile."

The *American Convention on Human Rights*, cited by the *Amicus Curiae*, pertinently declares in Article 5 that "punishment shall not be extended to any person other than the criminal," and "all persons deprived of their liberty shall be treated with respect for the inherent dignity of the human person." In Article 7 of the *Convention* it is agreed:

1. Every person has the right to personal liberty and security.

2. No one shall be deprived of his physical liberty except for the reasons and under the conditions established beforehand by the Constitution of the State Party concerned or by a law established pursuant thereto.

3. No one shall be subject to arbitrary arrest or imprisonment.

Two other principle sources of fundamental human rights are the *European Convention for the Protection of Human Rights and Fundamental Freedoms* (Rome 1950), and the *International Covenant on Civil and Political Rights*, G. A. Res. 2200A(XXI) Dec. 16, 1966, U.N. Gen.Ass.Off.Rec., 21st Sess., Supp. No. 16(A/6316) p. 52. Although the United States is not bound by either of these documents, they are indicative of the customs and usages of civilized nations.

The *European Convention*, brought into force in 1953 (213 U.N.T.S. 221) provides that everyone has the right to liberty and security of person and may not be deprived of liberty except in the specified cases and in accordance with a procedure prescribed by law. Section 4 further provides:

Everyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings by which the lawfulness of his detention shall be decided speedily by a court and his release ordered if the detention is not lawful.

The *International Covenant on Civil and Political Rights* contains several apposite paragraphs. Article 14, paragraph 7 provides:

No one shall be liable to be tried or punished again for an offence for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country.

Article 9 contains two pertinent provisions:

1. Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law.

&ast; &ast; &ast; &ast; &ast; &ast;

4. Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful.

Article 10, paragraph 1 declares that:

All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person.

Article 12, paragraph 1 provides:

Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence.

Members of our Congress and executive department have also recognized an international legal right to freedom from arbitrary detention. Congressman Donald M. Frasier as Chairman of the Subcommittee on International Organizations and the Commission on International Relations, House of Representatives, described prolonged detention without charges or trial as a gross violation of human rights:

Congress has sought to write some general laws establishing standards for the granting or withholding of military and

economic aid to nations in relation to the human rights issue. Generally we have said the military aid should be reduced or terminated to a country guilty of a consistent pattern of gross violations of internationally recognized human rights. We define gross violations as those involving the integrity of the person: torture, prolonged detention without charges or trial, and other cruel and inhuman treatment.

Frasier D., Human Rights and U.S. Foreign Policy—The Congressional Perspective, 1978 International Human Rights Law and Practice, 171,178. Patricia M. Derian, Assistant Secretary of State for Human Rights and Humanitarian Affairs, in discussing President Carter's policy on human rights stated:

> Our human rights concerns embrace those internationally recognized rights found in the United Nations Declaration of Human Rights. The specific focus of our policy is to seek greater observance by all governments of the rights of the person including freedom from torture and cruel and inhuman treatment, freedom from the fear of security forces breaking down doors and kidnapping citizens from their homes, and freedom from arbitrary detention.

Derian, P., Human Rights in U.S. Foreign Policy—The Executive Perspective, 1978; International Human Rights Law and Practice 183.

Tribunals enforcing international law have also recognized arbitrary detention as giving rise to a legal claim. The arbitrator in *France ex rel. Madame Julien Chevreau*, opined that the arbitrary arrest, detention or deportation of a foreigner may give rise to a claim under international law and that if detention is unnecessarily prolonged, a claim is justified. The arbitrator further stated that a claim is justified if the rule is not observed that the prisoner should be treated in a manner appropriate to his situation, and corresponding to the standard customarily accepted among civilized nations. M.S. Dept. of State, file no. 500. AIA/1197, cited in Whiteman, M., Damages in International Law (Washington 1937).

The cases cited earlier in this opinion which condemned protracted detention and detention beyond a reasonable time for deportation display our own judiciary's abhorrence of arbitrary detention.

Principles of customary international law may be discerned from an overview of express international conventions, the teachings of legal scholars, the general custom and practice of nations and relevant judicial decisions. *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980). When, from this overview a wrong is found to be of mutual, and not merely several, concern among nations, it may be termed an international law violation, *Id.*

International law is a part of the laws of the United States which federal courts are bound to ascertain and administer in an appropriate case. *The Nereide*, 13 U.S. (9 Cranch) 388, 422, 3 L.Ed. 769 (1815); *The Pacquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900); *Filartiga v. Pena-Irala, supra.* Our review of the sources from which customary international law is derived clearly demonstrates that arbitrary detention is prohibited by customary international law. Therefore, even though the indeterminate detention of an excluded alien cannot be said to violate the United States Constitution or our statutory laws, it is judicially remedial as a violation of international law. Petitioner's continued, indeterminate detention on restrictive status in a maximum security prison, without having been convicted of a crime in this country or a determination having been made that he is a risk to security or likely to abscond, is unlawful; and as such amounts to an abuse of discretion on the part of the Attorney General and his delegates.

Our need to resort to principles of international law in the resolution of this case lends credence to the commentator's view which follows:

> More broadly, and certainly more importantly for the international human rights movement, is the effectiveness of

international agreements in protecting individuals in the nations which are most committed to human rights. The United States, for example, preaches incessantly about the superiority of its system as a bulwark for human rights. The Constitution, it is claimed, is a remarkable document for many reasons, but particularly because it is a blueprint for the protection of individuals against government infringement. Thus, the argument goes, the United States need not concern itself with international human rights agreements. Rather, the United States should act as a catalyst to encourage other nations to create and be bound by international human rights agreements.

The United States, therefore, is signatory to very few international human rights agreements and ratifying state to even fewer such agreements. Moreover, a strong argument can be made that the United States does not follow even the spirit of some of the international human rights agreements to which it is a party. Instead, other concerns—economic, political, and social—assume preeminence to the detriment of human rights on an international scale.

The immigration policies of the United States make the point. For example, the United States has a long history as the valiant champion of the displaced refugee. The United States, it is said, has long embraced the political and social outcasts of other countries. Indeed the Statute of Liberty loudly proclaims this view:

> ... Give me your tired, your poor, Your huddled masses yearning to breathe free, The wretched refuge of your teeming shore. Send these, the homeless, tempest-tost to me, I lift my lamp beside the golden door!

For the present-day alien who attempts to obtain the status of asylum within the United States, the majestic words inscribed on the Statue of Liberty have a certain hollow ring. (footnotes omitted).

*Stotzky* at 240.

Of course, the acceptance of nearly 130,000 Cuban refugees into this country is indicative of our genuine concern for human rights. No country in the world has been more vocal in favor of human rights. It would not befit our history as a guarantor of human rights for our own citizens, to decline to protect unadmitted aliens against arbitrary governmental infringement of their fundamental human rights.

This Court has absolutely no desire to intrude upon matters of national security or executive decision-making and is not so arrogant as to feign expertise in the area of immigration law and policy. Such matters are wisely entrusted to a specialized agency. On this account, we have attempted to persuade respondent to instruct us as to potential solutions to the hard problem before us. We can only speculate that the INS and the State Department have been so overwhelmed handling the extraordinary assimilation of over 100,000 Cuban nationals into this country, not to mention pressing situations involving Iranian and Haitian aliens, as to have not had the available span of attention to perceive or counteract the possible violation of the fundamental human rights of less than two percent of the Cuban influx.

These rationalizations do not, however, assuage the extant violation of petitioner's fundamental human rights. Perpetuating a state of affairs which results in the violation of an alien's fundamental human rights is clearly an abuse of discretion on the part of the responsible agency officials. This Court is bound to declare such an abuse and to order its cessation. When Congress and the executive department decided to exclude certain aliens from entry into this country and thereafter allowed thousands to arrive upon our shores at once, it was their corollary responsibility to develop methods for processing this large influx of admissible and excludable aliens without offending any of their fundamental human rights. If, due solely to the morass created by these official decisions, some aliens who may not seem desirable have been caused to remain in the United States for attenuated periods of time, the courts cannot deny

them protection from arbitrary governmental action.

For all the foregoing reasons, the Court declares that when an excluded alien is brought upon our lands to be detained in a maximum security prison facility pending effectuation of exclusion, that alien may be detained in such a facility only for a determinate period of time. Furthermore, the maximum limit of such term should be made known to the alien upon the commencement of his detention.

Respondent shall be granted ninety (90) days from the date of this Memorandum and Order in which to terminate the arbitrary detention of petitioner. This may be accomplished in one of a number of ways. Petitioner may be deported, or he may be released on parole under conditions specified by the Attorney General. Or the INS may conduct a procedurally-adequate hearing to determine whether further detention of petitioner is warranted on a finding that he is likely to abscond, is a threat to security, or is a serious and actual threat to the safety of the person or the property of the citizens of this nation. Petitioner might well be housed in a refugee camp rather than a federal prison. Respondent might even devise and implement his own resolution to the problem of petitioner's arbitrary detention. If the arbitrary detention of petitioner is not terminated to the satisfaction of this Court within the specified time, the Court shall, at the end of said ninety-day period, grant the writ of habeas corpus and order petitioner released on parole.

Since criminal aliens who have committed crimes in their home country are normally disallowed entry to the United States before departing their homeland, we do not anticipate a reoccurrence of the situation confronting us in this case. We speculate that this opinion has the potential to affect, in addition to petitioner, only a small subset of aliens consisting of the other approximately 230 Cuban nationals detained at Leavenworth as well as the nearly 1800 Cubans held in federal prisons across the country.

In sum, we hold that the indeterminate detention of petitioner in a maximum security federal prison under conditions providing less freedom than that granted to ordinary inmates constitutes arbitrary detention and is a violation of customary international law; and that the continuation of such detention is an abuse of discretion on the part of the Attorney General and his delegates.

IT IS THEREFORE ORDERED that respondent be granted ninety (90) days from the date hereof in which to lawfully terminate the arbitrary detention of petitioner, and that if such detention is not terminated at the end of said period, the writ shall be granted and petitioner released on parole.

IT IS FURTHER ORDERED that petitioner be granted leave to proceed *in forma pauperis.*

IT IS SO ORDERED.