Lazaro **ALONSO–MARTINEZ**, et al., Appellants,

v.

Doris **MEISSNER**, Acting Commissioner, U.S. Department of Justice, Immigration and Naturalization Service, et al.

No. 81–2234.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 22, 1982.

Decided Jan. 21, 1983.

Richard A. Stern-Boswell, Washington, D.C., for appellants.

R. Craig Lawrence, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty. and Royce C. Lamberth, Asst. U.S. Atty., Washington, D.C., were on brief, for appellees. Kenneth M. Raisler, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellees.

Before WILKEY and GINSBURG, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Lazaro Martinez-Alonso[1] and Julio Moret are Cuban nationals who arrived in the United States in June 1980. On September 15, 1981, they petitioned the district court for a writ of habeas corpus. At that time, they were confined in Washington, D.C., at a facility known as Building B located on the grounds of St. Elizabeths Hospital.[2] They asserted that action on their asylum applications and the process to determine whether they are excludable had been delayed beyond a reasonable time.

On October 16, 1981, the district court denied their petition. The court referred to the "extreme circumstances" created by the arrival in Key West, Florida, in mid-1980, of approximately 125,000 Cubans, petitioners among them. These "Freedom Flotilla" arrivals[3] included several thousand persons who were released directly from prison or were mentally ill.[4] The court noted the limited scope of judicial inquiry with respect to the admission of aliens[5] and suggested that postponing decision on petitioners' excludability "may be in [their] best

1. The caption of this case refers to petitioner as Lazaro Alonso-Martinez. It appears from respondents' supplemental report to the court that his correct name is Lazaro Martinez-Alonso.

2. Building B was designated a "Service Processing Center" under an October 9, 1980, interagency agreement between the Immigration and Naturalization Service, the Department of Health and Human Services, and the Public Health Service. Under this agreement, the Immigration and Naturalization Service used Building B to detain Cuban refugees identified as needing mental health evaluation, and the Public Health Service undertook provision of medical care and mental health screening. See Banos v. Crosland, No. 80–2677, slip op. at 3–4 (D.D.C. Dec. 10, 1980). On October 20, 1980, prior to petitioners' transfer to Building B, several detainees filed applications for writs of habeas corpus challenging the legality of their detention at that facility. These petitions were denied in Banos, supra, slip op. at 11.

3. The point of departure for most of the arrivals was Mariel, Cuba; they are sometimes referred to as "Mariel Cubans."

4. Over 23,000 of the arrivals admitted prior criminal convictions. Supplemental Brief and Affidavit for Respondents, Weglian Affidavit [Weglian Aff.] ¶ 8. Cuba has refused to accept back any "Freedom Flotilla" Cubans found excludable under the Immigration and Naturalization Act. Weglian Aff. ¶ 14. See also Fernandez v. Wilkinson, 505 F.Supp. 787, 789 (D.Kan. 1980), aff'd sub nom. Rodriguez-Fernandez v. Wilkinson, 654 F.2d 1382 (10th Cir.1981).

5. The Supreme Court has consistently acknowledged the large authority of the political branches over the applications of aliens seeking initial admission to the United States. See Landon v. Plasencia, —— U.S. ——, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982). Specifically, the Court has observed that "over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." Kleindienst v. Mandel, 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972) (quoting Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909)); accord Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977). In the wake of the recent waves of immigrants, particularly those from Cuba and Haiti, law journal comments have urged more penetrating analysis by courts of the range of legislative and executive authority to exclude and detain aliens. See, e.g., Note, Statutory and Constitutional Limitations on the Indefinite Detention of Excluded Aliens, 62 B.U.L.Rev. 553 (1982); Note, Constitutional Limits on the Power to Exclude Aliens, 82 Colum.L.Rev. 957 (1982); Note, The Constitutional Rights of Excluded Aliens: Proposed Limitations on the Indefinite Detention of the Cuban Refugees, 70 Geo.L.J. 1303 (1982).

interests" if the Immigration and Naturalization Service (INS) pursues "efforts to place them in the community." Respondents' Appendix at 5.

We conclude that events occurring since the date of the district court's decision have so changed petitioners' situation as to render moot their September 15, 1981, habeas corpus application. We therefore vacate the district court's judgment and remand the case with a direction to dismiss the petition. *See United States v. Munsingwear,* 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950).

Congress has authorized the detention of aliens not clearly entitled to enter pending inquiry and determination whether they are excludable. 8 U.S.C. §§ 1222, 1225(b), 1226(a), (d).[6] While no fixed time limit is specified for the exclusion process, courts have read the relevant provisions to mean that the proceedings Congress ordered may not be unreasonably deferred. *See Rodriguez-Fernandez v. Wilkinson,* 654 F.2d 1382, 1389 (10th Cir.1981) ("the statute contemplates temporary detention . . . during proceedings to enter"); *Diaz v. Haig,* No. C81–

235 B (D.Wyo. Sept. 3, 1981) (granting writs of habeas corpus to juvenile aliens detained 14–16 months without excludability determination, holding, *inter alia,* that detention without such determination beyond temporary period is abuse of discretion); *Mir v. Wilkinson,* No. 80–3139 (D.Kan. Sept. 2, 1980) (ordering exclusion hearings within sixty days for Cuban refugees detained three months).

The posture in which this case appeared when the district court denied the habeas corpus petition occasioned our strong concern about the reasonableness of the delay in determining petitioners' status. We therefore ordered respondents, on October 27, 1982, to submit a supplemental brief addressed to a set of specific questions. That brief, filed November 29, 1982, and the accompanying affidavit with exhibits attached thereto, persuade us that the case described in the instant petition, whatever merit it may have had when filed, has become moot.

Petitioner Moret is no longer confined at Building B. He was paroled on April 9, 1982, pursuant to the Attorney General's

**6.** Detention of aliens pending an excludability determination is authorized by two sections of the Immigration and Naturalization Act of 1952, 8 U.S.C. §§ 1222, 1225(b).

8 U.S.C. § 1222 provides:

For the purpose of determining whether aliens (including alien crewmen) arriving at ports of the United States belong to any of the classes excluded by this chapter, by reason of being afflicted with any of the diseases or mental or physical defects or disabilities set forth in section 1182(a) of this title, or whenever the Attorney General has received information showing that any aliens are coming from a country or have embarked at a place where any of such diseases are prevalent or epidemic, such aliens shall be detained on board the vessel or at the airport of arrival of the aircraft bringing them, unless the Attorney General directs their detention in a United States immigration station or other place specified by him . . . *for a sufficient time* to enable the immigration officers and medical officers to subject such aliens to observation and an examination sufficient to determine whether or not they belong to the excluded classes. (Emphasis added.)

Prior to exclusion determinations in cases to which this section applies, the Public Health Service must certify its diagnosis of the alien's

disease or defect. *See* 8 U.S.C. § 1224. Certifications fall into three categories: Class A (mental or physical conditions constituting mandatory grounds for exclusion, *see* 8 U.S.C. § 1182(a)(1)–(6); 42 C.F.R. § 34.7); Class B (afflictions which may affect alien's earning ability, *see* 8 U.S.C. § 1182(a)(7); 42 C.F.R. § 34.8); and Class C (minor afflictions not likely to affect alien's earning ability, *see* 8 U.S.C. § 1182(a)(7); 42 C.F.R. § 34.10). An alien certified Class A under 8 U.S.C. § 1182(a)(1)–(5) may appeal the Public Health Service certification to the Surgeon General's Medical Board. 8 U.S.C. § 1224. A Class A certificate is conclusive in exclusion proceedings. 8 U.S.C. § 1226(d). Class B and Class C certificates are admissible in such proceedings, but are not conclusive. *See* 8 U.S.C. § 1226(a). *See generally* 1A C. Gordon & H. Rosenfeld, Immigration Law and Procedure §§ 3.15b, 3.20f(4) (1982).

The second detention-authorizing provision, 8 U.S.C. § 1225(b), states:

Every alien (other than an alien crewman) . . . who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. . . .

authority under 8 U.S.C. § 1182(d)(5)(A) (Supp. V 1981).[7] On March 31, 1982, the Department of State had recommended against granting Moret political asylum.[8] In view of Moret's parole, the INS has not proceeded to final decision on his asylum application, nor is it actively pursuing a determination that he is excludable.[9]

Petitioner Martinez-Alonso, with his consent, was transferred on September 29, 1982, to the U.S. Penitentiary in Atlanta. Of the approximately 1,145 "Freedom Flotilla" Cubans still in detention as of October 25, 1982, approximately 1,084 are being held at the Atlanta facility. On May 18, 1982, prior to Martinez-Alonso's transfer to Atlanta, the INS District Director denied his request for political asylum. Before this denial, the Director had received the State Department's recommendation against granting asylum to Martinez-Alonso. On October 28, 1982, following a reconsideration request pressed by petitioner's counsel, the INS resubmitted for State Department recommendation Martinez-Alonso's revised political asylum application. That application remains pending before the State Department.

7. This provision states:

> The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

Moret was paroled to Vision Quest, a private structured live-in program for adolescents. See Respondents' April 9, 1982, Notice to the Court. His parole to a private facility does not terminate judicial authority to rule on his petition. See Nguyen Da Yen v. Kissinger, 528 F.2d 1194 (9th Cir.1975). At oral argument, counsel for respondents withdrew the government's suggestion that, because Moret was "no longer in custody within the jurisdiction of this court," he was no longer "a party to this appeal." Brief for Respondents at 1 n. 1.

8. Respondents have informed the court that the INS has refrained from ruling on Moret's asylum application "in keeping with its policy to adjudicate only those political asylum applications filed by those Mariel Cubans who are being detained by the Attorney General." Weglian Aff. ¶ 31d.

9. On March 23, 1982, the Public Health Service reported that Moret qualified for a Class C (minor affliction not likely to affect earning ability) certificate. Supplemental Brief and Affidavit for Respondents [Supp.Br.] at F9. See supra note 6. Respondents do not indicate the basis on which Moret is currently considered excludable. The Attorney General has decided

"to seek exclusion only against those individuals who had been determined to be nonreleasable." Weglian Aff. ¶ 13. If a refugee such as Moret is paroled, the exclusion process is suspended. Id. ¶¶ 13e, 17. If parole is revoked and the refugee is returned to detention, the exclusion process is reactivated. Id. ¶ 16. Respondents advance three reasons for the Attorney General's decision: (1) Cuba's refusal to accept any "Freedom Flotilla" Cubans found excludable, see, e.g., Fernandez v. Wilkinson, supra note 4, 505 F.Supp. at 789 (Cuba either did not respond or responded negatively to six diplomatic notes regarding return of excludable Cuban nationals); (2) the pragmatic consideration that limited INS resources "could be put to better use than to adjudicate the exclusion of the 123,000 who had been paroled," Weglian Aff. ¶ 14; and (3) the possibility of a legislative solution to the refugee crisis, id.

In the context of the Mariel Cuban arrivals, the decision to defer the exclusion process for those not in detention appears reasonable. Indeed, an exclusion determination in Moret's case might work to his disadvantage. Section 501(e)(2)(B) of Title V of the Refugee Education Assistance Act of 1980, Pub.L. No. 96–422, 94 Stat. 1799 (Fascell-Stone Amendment) prohibits the use of funds under that Act for any refugee subject to a final, legally enforceable exclusion order. An exclusion order against Moret could mean that funds would not be available for his resettlement or special placement. Petitioner Martinez-Alonso is differently situated. As a member of the class certified in Fernandez-Roque v. Smith, see infra note 11, he is covered by a district court order prohibiting the return of any class member to Cuba. See Fernandez-Roque v. Smith, 539 F.Supp. 925, 930 n. 7, 947 (N.D.Ga.1982) (continuing temporary restraining order entered Aug. 19, 1981). Therefore an exclusion order in his case would not be considered "legally enforceable" within the meaning of the Refugee Education Assistance Act of 1980.

As a result of his transfer to the Atlanta Federal Penitentiary, Martinez-Alonso is now subject to the Attorney General's Review Plan for "Freedom Flotilla" Cubans detained in a Bureau of Prison facility.[10] He also became a member of the class certified in *Fernandez-Roque v. Smith.*[11]

In July 1982, Martinez-Alonso pursued a successful appeal to the Surgeon General's Medical Board from the Public Health Service's June 2, 1982, finding that he suffered from a personality disorder which rendered him excludable under 8 U.S.C. § 1182(a)(4).[12] Respondents now assert reliance on 8 U.S.C. § 1182(a) subsections (9) (conviction abroad of a crime involving moral turpitude) and (20) (no valid immigrant visa) as bases for excluding Martinez-Alonso[13] and claim that he falls within the

**10.** On July 22, 1981, the Attorney General established a Review Plan for all "Freedom Flotilla" Cubans detained in Bureau of Prison facilities. *See* Supp.Br. at A1–A7 (reflecting November 1981 revisions). *See also Palma v. Verdeyen,* 676 F.2d 100, 102 (4th Cir.1982) (describing Review Plan); *Fernandez-Roque v. Smith, supra* note 9, 539 F.Supp. at 929–30 (same). Under the Plan, a detainee is considered releasable if the Commissioner of INS determines, upon recommendation of a review panel, that the detainee is (1) currently nonviolent, (2) likely to remain nonviolent, and (3) unlikely to commit any criminal offense if released. Supp.Br. at A3–A4. In reaching this determination, the panel may consider (1) the detainee's disciplinary infractions while in custody, (2) his criminal history, (3) any mental health reports, (4) his participation in rehabilitation programs, and (5) any other relevant information. *Id.* at A4.

The panel reviewed Martinez-Alonso's file on October 28, 1982; it determined he was not "clearly releasable" and should undergo the more extensive review process which lasts 120–150 days. Weglian Aff. ¶¶ 29 n, o. If Martinez-Alonso is approved for release, the INS will attempt to parole him to a suitable sponsor, *id.;* if the panel decides against approving him for parole, the panel will again review his status within a year of that decision, *id.*

**11.** In *Fernandez-Roque v. Smith,* 91 F.R.D. 117 (N.D.Ga.1981), the district court in Atlanta (Shoob, J.) consolidated into a single class action two class actions and a single petitioner's action brought by Cuban refugees. As modified by a subsequent decision, *Fernandez-Roque v. Smith,* 91 F.R.D. 239, 241 n. 1 (N.D.Ga. 1981), the overarching class certified in *Fernandez-Roque* encompasses

all Cuban nationals who are presently incarcerated at the Atlanta Federal Penitentiary or who will be incarcerated there, and who arrived in the United States from Cuba as part of the "Freedom Flotilla" in 1980.

The district court also certified twelve precisely described subclasses. *See Fernandez-Roque v. Smith, supra,* 91 F.R.D. at 124. The government appealed Judge Shoob's temporary restraining order barring deportation of members of the class. The Eleventh Circuit held, *inter alia,* that the order was not appealable. *Fernandez-Roque v. Smith,* 671 F.2d 426 (11th Cir.), *on remand,* 539 F.Supp. 925 (N.D.Ga. 1982) (continuing temporary restraining order pending further appeal).

**12.** This section authorizes exclusion of "[a]liens afflicted with psychopathic personality, or sexual deviation, or a mental defect." At the time of this appeal to the Surgeon General's Medical Board, Martinez-Alonso was also considered excludable under 8 U.S.C. § 1182(a)(20), which authorizes exclusion of aliens who do not possess a valid immigrant visa. *See infra* note 13.

On December 14, 1981, while at St. Elizabeths Hospital, Martinez-Alonso received a psychiatric examination. Based on the evaluation at St. Elizabeths, on June 2, 1982, the Public Health Service certified him within Class A as suffering from an "[a]ntisocial personality disorder." Supp.Br. at E17; *see supra* note 6. Martinez-Alonso received an INS Form I–122 ("Notice to Applicant for Admission Detained for Hearing Before Immigration Judge"), dated July 16, 1982, notifying him he "may come within the exclusion provisions of Section 212(a)(4)[,](20)" of the Act as "an alien afflicted with psychopathic personality" and "an alien not in possession of a valid, unexpired immigrant visa." Supp.Br. at E15. He appealed the Class A certification to the Surgeon General's Medical Board, as authorized by 8 U.S.C. § 1224. *See also* 42 C.F.R. § 34.14. The Board took statements from Martinez-Alonso, and reviewed all his medical records; on July 23, 1982, the Board changed the diagnosis to "[a]dult antisocial behavior disorder," and cancelled the Class A certificate. Supp.Br. at E12, E15. A second Form I–122, dated November 2, 1982, notified Martinez-Alonso that he was considered excludable under subsections (9) and (20) of 8 U.S.C. § 1182(a). *See infra* note 13.

**13.** 8 U.S.C. § 1182(a)(9) authorizes exclusion of aliens

who have been convicted of a [nonpetty] crime involving moral turpitude (other than a purely political offense), or aliens who admit having committed such a crime, or aliens who admit committing acts which constitute the essential elements of such a crime.

sixth subclass designated in *Fernandez-Roque*.[14] It appears that the district judge who certified the class in *Fernandez-Roque* is diligently monitoring the progress of that action. *See, e.g., Fernandez-Roque v. Smith,* No. C81–1084 A (N.D.Ga. Nov. 23, 1982) (order directing adoption of procedures to expedite sponsorship of detained class members found releasable).

Moret's parole status and Martinez-Alonso's placement under the governance of the Attorney General's Review Plan and the *Fernandez-Roque* class action, as well as the mental health examinations and determinations both received, have overtaken the circumstances addressed in the petition. It may be that, contrary to the direction of Congress, respondents allowed more than "a sufficient time" to elapse before determining whether petitioners were excludable "by reason of being afflicted with [a mental defect]." *See* 8 U.S.C. § 1222, set out *supra* note 6.[15] Were we to remand at this juncture, however, our district court, in view of the limits on its authority, *see supra* note 5, could not order relief for petitioners beyond the changes in their situations that have already occurred. It is thus no longer vital to determine whether the district court correctly held, in October 1981, that it was lawful to continue petitioners' detention at Building B with no Public Health Service certification as to their mental health, no action on their asylum applications, and no exclusion proceedings in motion. We therefore do not decide that question. Our disposition today does not foreclose renewed petitions by Moret and Martinez-Alonso in an appropriate forum should future events so warrant.

*See also* 8 U.S.C. § 1182(a)(10) (alien excludable if convicted of two or more nonpolitical offenses if actual sentence exceeds five years imprisonment). In his June 11, 1980, request for asylum, Martinez-Alonso stated, in response to the question whether he had ever been arrested, "In 1970 I attempted the theft of a crate of fruit at San Miguel Padron, I was detained for one week. I never went to court. On 3/7/79 I was charged with the theft of money from an old man on a bus at Santiago de Cuba, I was sentenced to 2 years." Supp.Br. at E22. In his revised request for asylum, filed August 19, 1982, he did not mention this conviction, but claimed he was imprisoned from August 1978 to May 1980 "for talking with foreigners and allegedly trading on the black market." *Id.* at E6, E8. In a subsequent submission to the court, Martinez-Alonso stated that at his exclusion hearing he will challenge the government's assertion that he is excludable for conviction of a crime involving moral turpitude. Petitioners' Reply to Respondents' Supplemental Brief at 3. *See generally* Note, 62 B.U.L.Rev., *supra* note 5, at 588–592; Note, Exclusion or Deportation of Aliens for the Conviction of Foreign Crimes Involving Moral Turpitude: The Petty Offense Exception, 14 Cornell Int'l L.J. 135 (1981).

8 U.S.C. § 1182(a)(20) authorizes exclusion of

any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality.

As the district court observed in *Soroa-Gonzales v. Civiletti,* 515 F.Supp. 1049, 1059 (N.D. Ga.1981), it is "hardly surprising" that members of the "Freedom Flotilla" arrived without proper documentation. The court noted the irony that, "having invited 100,000 Cuban refugees into the United States without proper entry papers, the government [might] attempt to exclude each of them under § 1182(a)(20)." *Id.* at n. 12. *See also id.* at 1059–60 (detaining Cuban refugee as an excludable alien because he lacked valid immigration papers constituted an abuse of discretion when detention was in fact occasioned by unsupported suspicion that refugee had engaged in criminal activity in Cuba).

14. The certification delineates this subclass as follows:

6. Those Cuban detainee class members who have had or will have exclusion hearings, and who have been found or will be found to be excludable for conviction of, or admission of the essential elements of, any crime in Cuba which would constitute a felony under the Criminal Code of the District of Columbia, but is not a crime of violence against the person.

*Fernandez-Roque v. Smith, supra* note 11, 91 F.R.D. at 124.

15. Petitioner Moret was paroled less than three weeks after the Public Health Service ranked his mental affliction as "minor." *See supra* p. 1163 and note 9. But the certification of his Class C status, *see supra* note 6, postdated the denial of his petition by over five months. Certification of petitioner Martinez-Alonso's mental condition also ran a protracted course. *See supra* note 12.

*Judgment vacated and case remanded with direction to dismiss petition as moot.*