Matthew HERMANOWSKI, Petitioner,

v.

Steven J. FARQUHARSON, in his official capacity as District Director, Providence Office Immigration and Naturalization Service; Janet Reno, in her capacity as Director of the Department of Justice of the United States of America; and any other persons having the Petitioner in custody, Respondents.

No. 97–220L.

United States District Court,
D. Rhode Island.

March 1, 1999.

Louis B. Abilheira, Warren, RI, Scott C. Baer, Swansea, MA, Judy Rabinovitz, ACLU, Immigrants' Rights Project, New York City, for petitioner.

Anthony C. DiGioia, U.S. Attorney's Office, Providence, RI, Karen Ann Hunold, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, for respondents.

## OPINION AND ORDER

LAGUEUX, Chief Judge.

Petitioner Matthew Hermanowski, formerly a legal resident alien, has been ordered to be deported from the United States by Respondent, Immigration and Naturalization Service ("INS"). The INS has been unable to execute Hermanowski's deportation order due to diplomatic difficulties with Hermanowski's native Poland. While these two governments have debated his fate, Hermanowski has now been held in federal custody for twenty-eight months under an order of detention pending deportation. Accordingly, he seeks from this Court a Writ of Habeas Corpus pursuant to Article I, Section 9 of the United States Constitution and 28 U.S.C. § 2241. Hermanowski's Amended Petition alleges that the federal government is detaining him in violation of the due process rights guaranteed to him under the United

States Constitution and demands that he be released from federal detention. Respondents moved to dismiss, claiming both a lack of jurisdiction in this Court to entertain the petition and a failure to exhaust administrative remedies by the petitioner. This matter was initially referred to United States Magistrate Judge Jacob Hagopian who issued a Report and Recommendation advising that the motion to dismiss be denied and that Hermanowski's Amended Petition be granted. Respondents' Objections to the Report and Recommendation are now before the Court. For the reasons set forth below, the Report and Recommendation is adopted with modifications. Respondents' motion to dismiss is denied and the Amended Petition for a Writ of Habeas Corpus will be granted with conditions.

## BACKGROUND

In 1973, when he was 15 years old, Hermanowski left his native Poland and established a new life for himself here in the United States as a legal permanent resident alien. His mother and five siblings are also permanent residents of this country. He married a citizen of the United States and had two children here. Hermanowski returned his adoptive country's favor by embarking upon a career as a petty criminal. Hermanowski's encounters with the criminal justice system are numerous. His resume includes convictions for assault with intent to rob, purse snatching, possession of marijuana with the intent to distribute, possession of cocaine with the intent to distribute, and manufacture or delivery of cocaine.

Due to Hermanowski's prolific, if minor league, criminal history, the INS sought and obtained in 1992 a ruling by an Immigration Judge ordering Hermanowski deported to Poland. The Board of Immigration Appeals in 1994 denied Hermanowski's challenge to the Immigration Judge's decision and Hermanowski failed to exercise his right to further appeals in the federal courts. While these proceedings were ongoing, Hermanowski was serving a sentence in state prison. On September 14, 1996, Hermanowski, having completed his state sentence, was taken into custody by the INS under the authority of an immigration detainer filed by the agency. Since that date, Hermanowski has been held in INS custody at the Adult Correctional Institutions in Cranston, Rhode Island (the state prison where he served his time for state criminal convictions) awaiting deportation.

Within days of taking custody of Hermanowski, the INS began its quest to obtain the travel documents necessary to deport Hermanowski to his native land. According to an INS staff officer familiar with Hermanowski's case, the Providence District Office of the INS requested the documents from the Polish Consulate in New York City on September 16, 1996. After a second call made by the INS in November, the Polish government responded on December 19, 1996. Counselor Marcin Knapp of Poland wrote to the Providence District Office and explained that Poland refused to issue travel documents to Hermanowski and that the government of Poland did not consent to his deportation. This is the only official statement ever issued by the Polish government with regard to Hermanowski's travel status and deportation.

Following this official rebuff, the Providence Office of the INS sought the assistance of higher federal authorities. Local INS officers turned to the agency's Washington, D.C. headquarters on December 24, 1996 for help. In February 1997, INS officials in Washington twice requested a review of the travel document request by the Polish consular staff. These entreaties were initially ignored. An INS staff officer finally met with the Second Secretary and the Consul General at the Polish Embassy on March 3, 1997 for the purpose of reviewing the request. The Polish authorities gave no indication at that meeting that their position on the request had changed.

The federal government redoubled its efforts. On May 30, 1997, an INS staff officer in Washington enlisted the aid of the State Department's Desk Officer for Poland in pressing the Polish government through diplomatic channels for the travel documents. The State Department's intervention resulted in a conference on August 14, 1997 between the First Secretary of the Polish Embassy and United States officials during which a number of outstanding requests were discussed, including the Hermanowski case. The First Secretary later informed the State Department that she had discussed the outstanding cases with the Polish Ambassador to the United States and that she was awaiting further instructions from the Polish government in Warsaw. Despite this high-level attention to Hermanowski's status, Poland has never indicated that it was willing to alter its initial decision.

In addition to these diplomatic efforts in Washington, the United States government pursued the matter through its Embassy in Warsaw. According to an INS staff officer, the Consul General of the United States Embassy in Warsaw has been able in the past to secure travel documents for Polish citizens even after the Polish government initially denied the United States' requests for those documents. However, in Hermanowski's case, the Polish government has not issued any official statement that contradicts its refusal of December 1996 to issue travel documents.

While the diplomats conferenced, Hermanowski hoped to be released on bail from detention in the state prison. On December 4, 1996, Hermanowski requested of the INS District Director, Charles Cobb, that he be released on bond until the INS secured the necessary travel documents from the Polish government. Cobb denied the request on December 12, 1996, concluding that Hermanowski had failed to carry the burden imposed upon detainees seeking release on bond under the provisions of former 8 U.S.C. § 1252(a)(2)(B) (1995) (repealed). Although federal law permitted Hermanowski to appeal the District Director's denial of bail to the Board of Immigration Appeals, *see* 8 C.F.R. § 3.1(b)(7), he did not avail himself of this opportunity.

Hermanowski responded to this denial of bail by filing, pro se, a Petition for a Writ of Habeas Corpus in this Court. After engaging counsel, Hermanowski filed an Amended Petition in which he alleges that in detaining him pending deportation the federal government violates both the procedural and substantive aspects of the right to due process guaranteed by the Fifth Amendment to the United States Constitution. The Amended Petition and respondents' motion to dismiss were referred to United States Magistrate Judge Jacob Hagopian. The Magistrate Judge, without having held a hearing on the matter, issued a Report and Recommendation on June 1, 1998 recommending that the motion to dismiss be denied, that the Amended Petition for a Writ of Habeas Corpus be granted, and that Hermanowski be released from further detention pending the deportation process.

The Magistrate Judge explained that the authority of the INS to detain an alien pending execution of a deportation order is subject to limits imposed by the United States Constitution. In this case, the Magistrate Judge concluded that the INS violated Hermanowski's Fifth Amendment right to substantive due process by restricting his liberty in a manner that "shocks the conscience." The Magistrate Judge reasoned that detention pending deportation may pass constitutional muster if it serves a legitimate governmental purpose. In the context of the typical deportation proceeding of a convicted felon, the Magistrate Judge acknowledged that detention serves two important objectives: facilitating actual deportation when the time is right and preventing further criminal activity pending removal of the alien from American shores. However, the Magistrate Judge concluded that the con-

tinued detention of Hermanowski was no longer rationally related to a legitimate governmental purpose. Based on the totality of the circumstances, the Magistrate Judge found that deportation of Hermanowski to Poland "in the foreseeable future is, at best, improbable." Magistrate Judge Hagopian accordingly recommended that the motion to dismiss be denied and that the Amended Petition for a Writ of Habeas Corpus be granted, releasing Hermanowski from continued detention by federal authorities. The Report and Recommendation did not address Hermanowski's procedural due process claim.

The INS now raises several objections to the Report and Recommendation. The INS challenges the Magistrate Judge's conclusions regarding the scope of this Court's jurisdiction to hear this Amended Petition, the proper Constitutional framework for analysis of the case, and the application of that framework to the facts in the record. Because of the important constitutional principles involved and because this Court does not entirely adopt the Magistrate Judge's conclusions, the Court will address each of these points of contention.

## DISCUSSION

### I. Standard of Review

■ Determinations made by magistrate judges on dispositive pretrial motions and prisoner petitions are reviewed de novo by the district court. *See* Fed. R.Civ.P. 72(b). In making a de novo determination, the district court "may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." *Id.; see also* 28 U.S.C. § 636(b)(1). In reviewing a magistrate judge's recommendations, the district court must actually review and weigh the evidence presented to the magistrate judge, and not merely rely on the magistrate judge's report and recommendation. *See United States v. Raddatz,* 447 U.S. 667, 675–76, 100 S.Ct. 2406, 65 L.Ed.2d 424

(1980); *Gioiosa v. United States,* 684 F.2d 176, 178 (1st Cir.1982); *Branch v. Martin,* 886 F.2d 1043, 1046 (8th Cir.1989); 12 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3070.2, at 382–87 (2d ed.1997).

### II. Analysis

### A. Jurisdiction over the Habeas Corpus Petition

■ This Court is authorized by statute and the United States Constitution to exercise jurisdiction over Hermanowski's Amended Petition for a Writ of Habeas Corpus. This Court is mindful that recent federal legislation has narrowed the range of legal challenges brought by aliens that are cognizable by the federal courts. Two changes in immigration law are especially notable for the purposes of this case. The first important change was the repeal by the Antiterrorism and Effective Death Penalty Act of 1996 of the special immigration provision for writs of habeas corpus available to aliens held in custody pursuant to deportation orders that was previously found in the Immigration and Naturalization Act ("INA"). *See* Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, § 401(e), 110 Stat. 1214 (Apr. 24, 1996) (repealing 8 U.S.C. § 1105a(a)(10)). In addition to eliminating this avenue of judicial relief, the statute declared that "[a]ny final order of deportation against an alien who is deportable by reason of having committed [an aggravated felony] shall not be subject to review by any court." AEDPA § 440, 110 Stat. at 1276 (codified at 8 U.S.C. § 1105a(a)(10)). Another significant amendment to the immigration laws was the grant by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 of exclusive jurisdiction over removal proceedings to the Attorney General. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, Div. C., § 306, 110 Stat. 3009–546 (Sept. 30, 1996) (codi-

fied at 8 U.S.C. § 1252(g)). Nonetheless, despite this whirlwind of reform stirred up by Congress, this Court's authority to review constitutional complaints delivered by a petition for a writ of habeas corpus has weathered the storm.

The Great Writ has been recognized by countless generations as one of the bulwarks of liberty under the Anglo–American system of government. William Blackstone praised this "most celebrated writ in the English law" as "efficacious ... in all manner of illegal confinement." 3 William Blackstone, *Commentaries* 129, 131 (6th ed. 1775). In particular, the English and Americans alike recognized that the "traditional Great Writ was largely a remedy against executive detention." *Swain v. Pressley,* 430 U.S. 372, 386, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977) (Burger, C.J., concurring). The usefulness of the Writ as a guardian of democratic government was advertised by prominent proponents of the new American constitution who encouraged that the Writ be "provided for, in the most ample manner." *The Federalist,* No. 83, at 499 (Alexander Hamilton) (Clinton Rossiter ed., 1961). In England, its roots predate Magna Charta, in this country, Habeas Corpus was enshrined at the founding in Article I of the national Constitution. *See* U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."). Statutory jurisdiction of the federal courts over the ancient Writ originated in the Judiciary Act of 1789. *See* Judiciary Act of 1789, ch. 20, § 14, 1 Stat. 73, 81–82. This grant of jurisdiction is now lodged at 28 U.S.C. § 2241. No act of Congress has stripped this Court of its time-worn duty to redress constitutional complaints presented to the Court in a petition for this ancient Writ.

The general Habeas Corpus provision of federal statutory law provides that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241(a). A writ may be granted if, inter alia, the petitioner "is in custody under or by color of the authority of the United States" or "is in custody in violation of the Constitution or laws · or treaties of the United States." *Id.* § 2241(c)(1), (3).

Some federal courts have concluded that legislation recently enacted by Congress has stripped the federal courts of their power to exercise jurisdiction under § 2241 over the habeas corpus petitions of deportable and excludable aliens. *See, e.g., LaGuerre v. Reno,* 164 F.3d 1035, 1040 (7th Cir.1998); *Richardson v. Reno,* 162 F.3d 1338, 1357 (11th Cir.1998). However, the United States Court of Appeals for the First Circuit has adopted a contrary view of that recent legislation. In *Goncalves v. Reno,* 144 F.3d 110 (1st Cir. 1998), the Court of Appeals held that neither the AEDPA nor the IIRIRA deprived the federal courts of § 2241 jurisdiction over the habeas corpus petitions of persons ordered excluded or deported from the United States. *See id.* at 123. Other federal courts have agreed. *See Sandoval v. Reno,* 166 F.3d 225, 237 (3d Cir.1999); *Henderson v. INS,* 157 F.3d 106, 118–22 (2d Cir.1998); *Magana–Pizano v. INS,* 152 F.3d 1213, 1221–22 (9th Cir.1998) (per curiam); *Jean–Baptiste v. Reno,* 144 F.3d 212, 219–20 (2d Cir.1998); *Lee v. Reno,* 15 F.Supp.2d 26, 37–39 (D.D.C.1998); *Tam v. INS,* 14 F.Supp.2d 1184, 1187–88 (E.D.Cal. 1998); *Barrett v. INS,* 997 F.Supp. 896, 900 (N.D.Ohio 1998); *Gutierrez–Martinez v. Reno,* 989 F.Supp. 1205, 1209 (N.D.Ga. 1998); *Morisath v. Smith,* 988 F.Supp. 1333, 1338–39 (W.D.Wash.1997); *Mojica v. Reno,* 970 F.Supp. 130, 157 (E.D.N.Y. 1997). Therefore, this Court has the power to continue to exercise jurisdiction over habeas corpus petitions filed by aliens pursuant to the statutory grant codified at 28 U.S.C. § 2241.

## B. Exhaustion of Administrative Remedies

■ Respondents also argue that this Court should decline to hear Hermanow-

ski's plea because he failed to pursue an administrative appeal of the District Director's denial of bail. This argument is without merit. Hermanowski's failure to exhaust his administrative remedies does not hamper this Court's ability to exercise jurisdiction over his Amended Petition for a Writ of Habeas Corpus. The United States Supreme Court has explained: "Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs." *McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (citations omitted). Although Congress has substantially rewritten much of the federal immigration statutes in recent years, it has not created an exhaustion requirement for judicial review of alien custody claims. Therefore, exhaustion of administrative remedies is not a prerequisite to this Court's invocation of jurisdiction over this habeas corpus request. *See Montero v. Cobb,* 937 F.Supp. 88, 90–91 (D.Mass.1996) (holding that an alien need not exhaust administrative remedies in order to challenge a predeportation order of detention in federal court). Furthermore, at stake in this proceeding is a constitutional question regarding the validity of indefinite detention. Determination of that question does not include review of the administrative procedures employed by the INS in denying Hermanowski's bail. Because Hermanowski's Fifth Amendment substantive due process claim in his habeas corpus petition does not implicate the adequacy of the procedures afforded him by the INA or the validity of the decision of the INS in applying the provisions of the INA, "he was not statutorily required to exhaust his administrative remedies prior to seeking judicial relief for the violation of his due process rights." *Wang v. Reno,* 81 F.3d 808, 814 (9th Cir. 1996).

## C. Scope of Habeas Corpus Review

■ Satisfied that this Court properly exercises jurisdiction over this Amended Petition, the Court must define the scope of review under § 2241 to be applied to Hermanowski's claims. Some federal courts have concluded that in the immigration context, only a "fundamental miscarriage of justice or a substantial constitutional problem" is properly subject to judicial review under § 2241. *Morisath,* 988 F.Supp. at 1339; *see Mbiya v. INS,* 930 F.Supp. 609, 612 (N.D.Ga.1996). However, in this circuit, the scope of § 2241 review in immigration matters is not to be so narrowly construed. According to the First Circuit's instructions in *Goncalves,* habeas corpus review under § 2241 may encompass more than constitutional claims: "[t]he language of § 2241 itself does not contemplate a limitation of jurisdiction only to constitutional claims; instead, it contemplates challenges based on the 'Constitution or laws or treaties of the United States.'" *Goncalves,* 144 F.3d at 123–24 (quoting 28 U.S.C. § 2241). The Court of Appeals did not specify the precise boundaries of constitutional review, however. Although the *Goncalves* Court did not specifically address the constitutional standard to be applied, this Court concludes that the *Goncalves* decision permits judicial review of any claim based on an alleged violation of rights guaranteed by the Constitution. Logic compels this conclusion. Since *Goncalves* allows consideration of statutory claims it must also countenance redress of violations of superior rights, namely, constitutional rights, even those that do not rise to the level of grave constitutional error.

The alleged offenses to his constitutional rights set forth in Hermanowski's Amended Petition for a Writ of Habeas Corpus fall squarely within the parameters of § 2241 review as defined by the Court of Appeals in *Goncalves.* Hermanowski argues that his substantive and procedural due process rights, both guarded by the Fifth Amendment to the United States Constitution, continue to be violated by his physical detention by the federal govern-

ment pending his deportation.[1] Such claims fall within this Court's scope of review for petitions for writs of habeas corpus filed pursuant to § 2241.

## D. The Statutory Basis for Detention

When Hermanowski was released from state custody, federal law required that the Attorney General, acting through the INS, take into custody certain aliens ordered deported until actual deportation could be executed. *See* 8 U.S.C. § 1252(a)(2)(A) (1995) (repealed by IIRIRA § 306). This requirement applied to any alien who had previously been convicted of committing an "aggravated felony" as defined by federal statute, even though that person had already completed the sentence imposed for the aggravated felony. *See id.* Hermanowski had previously been convicted of a narcotics violation that qualified as an aggravated felony, and therefore, he was subject to the detention provision. *See* 8 U.S.C. § 1101(a)(43) (including "illicit trafficking in a controlled substance" as a crime that qualifies as an "aggravated felony"). Accordingly, Hermanowski's initial detention by the INS was statutorily proper. Hermanowski does not contest the legality of the initial detention.

▮ Upon being taken into INS custody, Hermanowski immediately sought to be released on bond. The INS District Director denied the request, finding that Hermanowski did not satisfy the release conditions of federal law. According to the transitional period custody rules of IIRIRA, the Attorney General "may release the alien only if the alien ... (i) was lawfully admitted to the United States and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." IIRIRA § 303(b)(3)(B). The detainee

bears the burden of proving fitness for release under the terms of the statute. *See id.* The District Director denied the bond request after determining that Hermanowski had failed to carry his burden of proving that he was not a flight risk or a danger to the community. In this proceeding, this Court will not directly review the propriety of the District Director's bond determination. At issue here is not a question of administrative law, but a far more fundamental question of constitutional rights. *See Tam,* 14 F.Supp.2d at 1190.

The statute that permitted the INS to take Hermanowski into federal custody places no limitation on the duration of detention pending deportation. *See* 8 U.S.C. § 1252(a) (1995) (amended by IIRIRA); IIRIRA § 303(b)(3)(B). Federal courts have acknowledged that indefinite detention is not precluded by the immigration statutes. *See Zadvydas v. Caplinger,* 986 F.Supp. 1011, 1025 (E.D.La.1997); *Tran v. Caplinger,* 847 F.Supp. 469, 473–74 (W.D.La.1993). In fact, IIRIRA eliminated the six month limitation on detention pending deportation that was contained in the previous incarnation of the immigration statute. *See* IIRIRA § 305 (repealing 8 U.S.C. § 1252(c)). Therefore, it is clear that Hermanowski's detention, even for an indefinite period does not run afoul of the federal immigration statutes. Whether such detention can survive constitutional scrutiny is another matter entirely.

## E. Constitutional Limits on Immigration Detention

▮ Removal of aliens is a power inherent in every sovereign and is largely exercisable by the political branches of government. *See Mathews v. Diaz,* 426 U.S. 67, 80–81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Carlson v. Landon,* 342 U.S. 524, 534, 72 S.Ct. 525, 96 L.Ed. 547 (1952); *see also Fong Yue Ting v. United States,*

---

1. It should be noted however, that given the core liberty interest at stake here, Hermanowski's claim of improper detention would also fall well within the bounds of the more nar-row scope of habeas corpus review of federal courts that require the finding of a grave constitutional error or a fundamental miscarriage of justice.

149 U.S. 698, 711, 13 S.Ct. 1016, 37 L.Ed. 905 (1893) (control of immigration is an "inherent and inalienable right of every sovereign and independent nation, essential to its safety, its independence, and its welfare"). As a political prerogative that lies near the core of national sovereignty, it is "largely immune from judicial control." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *see United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 94 L.Ed. 317 (1950); *Gisbert v. U.S. Attorney Gen.*, 988 F.2d 1437, 1440 (5th Cir.1993); *Jean v. Nelson*, 727 F.2d 957, 964–65 (11th Cir.1984) (en banc), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). The majoritarian components of our national government share plenary authority to regulate the admission of aliens to this country. *See Gisbert*, 988 F.2d at 1440; *Doherty v. Thornburgh*, 943 F.2d 204, 209 (2d Cir. 1991); *see also* U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power . . . To establish an uniform Rule of Naturalization . . . ."). Accordingly, judicial review of such decisions must be restrained. *See Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (" '[O]ver no conceivable subject is the legislative power of Congress more complete . . . .' " (quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909))).

 However, the power of executive branch officers to detain aliens pending deportation pursuant to a statutory grant of authority is not without limits. This power, like most powers of government, is subject to the counter-weight of due process. Restrictions on physical liberty imposed by government officials must not offend the Fifth Amendment's guarantee that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This Court, therefore, must determine whether it is inconsistent with the Constitution's promise of due process for the INS to

detain Hermanowski for an indefinite length of time until his deportation can be achieved.

The due process right contained in the Fifth Amendment is composed of procedural and substantive components. Procedural due process focuses on the fairness of the procedures used by the government when it acts to deprive a person of life, liberty, or property. *See Mathews v. Eldridge*, 424 U.S. 319, 332–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Substantive due process guards against governmental interference with those rights "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 324–25, 58 S.Ct. 149, 82 L.Ed. 288 (1937), and prohibits the government from engaging in conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). When substantive due process rights are properly invoked, they guard against certain government intrusions into the private sphere regardless of the fairness of the process employed by the government. *See Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

Because Hermanowski is not an American citizen, analysis of his due process claims must begin with an examination of the scope of the due process rights that he may invoke. As an alien, Hermanowski does not enjoy the full panoply of rights enjoyed by United States citizens. *See Reno v. Flores*, 507 U.S. 292, 305–06, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Diaz*, 426 U.S. at 79–80, 96 S.Ct. 1883. In regulating non-citizens, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Diaz*, 426 U.S. at 80, 96 S.Ct. 1883. However, Hermanowski is not deprived of all of the protections of the Due Process Clause of the Fifth Amendment merely because he is not a citizen of the United States. *See Plyler v. Doe*, 457 U.S. 202, 210–12, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (holding that the Fifth Amendment's Due Process Clause applies to all persons present within the territorial

confines of the United States); *Wong Wing v. United States,* 163 U.S. 228, 237–38, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (same). In order to define the contours of those protections, this Court must explore the distinction recognized by the federal courts between excludable and deportable aliens.

The United States Supreme Court has explained that there is a distinction in the law for due process purposes "between those aliens who have come to our shores seeking admission ... and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category." *Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958); *see Landon v. Plasencia,* 459 U.S. 21, 32–33, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982); *Mezei,* 345 U.S. at 212, 73 S.Ct. 625; *Jean,* 727 F.2d at 968.

 Excludable aliens are those aliens who seek admission to this country, but have not secured it. Aliens who fall within the definition of this grouping may claim only those procedural due process rights that Congress chooses to grant them. *See Knauff,* 338 U.S. at 544, 70 S.Ct. 309 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."). Furthermore, the extent of any substantive due process rights enjoyed by excludable aliens is uncertain, for "the Supreme Court has questioned the extent to which aliens possess substantive rights under the due process clause." *Doherty,* 943 F.2d at 209. In contrast, deportable aliens, those who have been ordered deported after having gained admission to the United States, are afforded greater procedural and substantive rights than excludable aliens. *See Landon,* 459 U.S. at 32–33, 103 S.Ct. 321; *Gisbert,* 988 F.2d at 1442 n. 8. The Supreme Court has examined the range of procedural due process rights guaranteed deportable aliens by the Constitution. *See, e.g., Landon,* 459 U.S.

at 32–33, 103 S.Ct. 321; *Bridges v. Wixon,* 326 U.S. 135, 153–54, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945); *The Japanese Immigrant Case,* 189 U.S. 86, 100–01, 23 S.Ct. 611, 47 L.Ed. 721 (1903). However, the exact nature of a deportable alien's right to substantive due process is less clear. Although Hermanowski raised both procedural and substantive due process claims in his Amended Petition, the Magistrate Judge determined that the latter claim was dispositive of the matter. Since that claim, in fact, is dispositive, this Court will address that claim only.

 This Court does not seek to endow upon deportable aliens new substantive due process rights or to trail blaze into the terra incognita of this unresolved jurisprudence. As the Supreme Court has counseled, this Court must "exercise the utmost care" when exploring the boundaries of substantive due process rights, for the "guideposts for responsible decisionmaking ... are scarce and open-ended." *Collins,* 503 U.S. at 125, 112 S.Ct. 1061. However, there is firm doctrinal ground upon which this Court may rest its analysis of Hermanowski's substantive due process claim. Although the outer limits of such rights in the case of a deportable alien are murky, it is clear that even deportable aliens enjoy some measure of the due process right to be free from unreasonable detention by the government. *See Flores,* 507 U.S. at 315, 113 S.Ct. 1439 (O'Connor, J., concurring) (declaring that a juvenile alien has a "core liberty interest in remaining free from institutional confinement"); *Doherty,* 943 F.2d at 208 (holding that deportable aliens "possess a substantive due process right to liberty during deportation hearings"); *see also Alvarez-Mendez v. Stock,* 941 F.2d 956, 962–63 & n. 6 (9th Cir.1991); *Tam,* 14 F.Supp.2d at 1191; *Zadvydas,* 986 F.Supp. at 1025–26.

The Due Process Clause, however, grants no absolute right to be free from detention, even to those who have been convicted of no crime. The United States Supreme Court has recognized several im-

portant societal interests that can trump even this most fundamental incarnation of the concept of liberty. *See United States v. Salerno*, 481 U.S. 739, 748, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest."); *see also Schall v. Martin*, 467 U.S. 253, 281, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (allowing pretrial detention of juvenile delinquents considered dangerous); *Bell v. Wolfish*, 441 U.S. 520, 535–40, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (allowing detention until trial of an accused if the court finds that there is a risk of flight); *Addington v. Texas*, 441 U.S. 418, 425–26, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (allowing detention of dangerous defendants who are incompetent to stand trial); *Carlson*, 342 U.S. at 537–42, 72 S.Ct. 525 (allowing detention of potentially dangerous aliens pending deportation); *Ludecke v. Watkins*, 335 U.S. 160, 170–72, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948) (allowing detention during times of war of persons considered dangerous). Under the proper circumstances, detention of deportable aliens also passes constitutional muster. At some point, however, even a detention that began within constitutional bounds can raise serious questions regarding the infringement of protected personal liberties.

The federal courts that have addressed the constitutionality of indefinite detention of aliens have turned for guidance to the Supreme Court's analysis of preventive pretrial detention of accused juvenile delinquents in *Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984). *See Gisbert*, 988 F.2d at 1441–42; *Tam*, 14 F.Supp.2d at 1191; *Cholak v. United States*, 1998 WL 249222, at *7–8 (E.D.La. 1998) (unreported decision); *Zadvydas*, 986 F.Supp. at 1025–26. According to established doctrine, a regulatory detention must not be imposed for punitive purposes. *See Schall*, 467 U.S. at 269, 104 S.Ct. 2403. The validity of regulatory detentions such as those involved in *Schall* and the case

sub judice is tested by an inquiry into the legislative purpose of the restriction, for detention does not always amount to punishment. *See Bell*, 441 U.S. at 537, 99 S.Ct. 1861. " 'A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.' " *Schall*, 467 U.S. at 269, 104 S.Ct. 2403 (quoting *Bell*, 441 U.S. at 538, 99 S.Ct. 1861); *see Salerno*, 481 U.S. at 747, 107 S.Ct. 2095 ("To determine whether a restriction on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent."). Unless the petitioner can demonstrate an express governmental intent to punish, the court must determine " 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it.' " *Schall*, 467 U.S. at 269, 104 S.Ct. 2403 (quoting *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). Finally, the court must decide what is often the determinative issue: whether the detention is excessive in relation to the "alternative purpose" proffered. *See id.*

Federal courts have consistently held that deportation is not a criminal proceeding and is not punitive in purpose. *See INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984); *Carlson*, 342 U.S. at 537, 72 S.Ct. 525; *Gisbert*, 988 F.2d at 1442 n. 8. Detention pending deportation is merely an administrative incident to the civil deportation process. As an ancillary procedure to a non-punitive proceeding, detention pending deportation is not imposed for the purpose of punishing the alien. *See Zadvydas*, 986 F.Supp. at 1026 ("Congress did not contemplate permanent detention as a means of punishment for aliens convicted of aggravated felonies who have already served their sentence."); *Tran*, 847 F.Supp. at 475 ("Congress did not provide for detention of aliens convicted of aggravated felonies as a means of punishment.").

Several important governmental objectives can be advanced by the practice of detention pending deportation. Identification of these objectives is important because "if a particular condition or restriction of ... detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539, 99 S.Ct. 1861. First, detention helps to guarantee reliable and speedy deportation by preventing the alien from absconding during the pendency of the deportation proceedings. *See Zadvydas*, 986 F.Supp. at 1026; *Tran*, 847 F.Supp. at 475. Second, detention of an alien who has been convicted of an aggravated felony furthers the government's efforts to protect the community from criminal behavior. *See Carlson*, 342 U.S. at 538, 72 S.Ct. 525; *Zadvydas*, 986 F.Supp. at 1026. Given these legitimate interests in detention pending deportation, such detention does not amount to punishment for purposes of due process analysis.

If a substantive due process violation is to be found in the practice of detention pending deportation, it can only be based upon a finding that the detention under a particular set of factual circumstances is excessive in relation to the governmental purposes behind the restriction in that particular context. Such a determination is highly dependent on the unique facts of each case. Nonetheless, consideration of several factors that have been identified by federal courts as relevant to such an examination will help to provide structure to this inquiry. Specifically, this Court will focus on the length of detention to which the petitioner has already been subjected,[2] the likelihood of deportation, the potential length of the detention into the future, the likelihood that release will frustrate the petitioner's actual deportation, and the

danger to the community posed by the petitioner if released. *See Tam*, 14 F.Supp.2d at 1191–92 (considering the length of detention, the possibility of eventual deportation, and the danger to the community posed by the detainee); *Zadvydas*, 986 F.Supp. at 1026–27 (considering the length of detention and the possibility of eventual deportation); *Fernandez v. Wilkinson*, 505 F.Supp. 787, 793 (D.Kan. 1980) (considering the likelihood of deportation "in the foreseeable future"). In analyzing the flight risk presented by the petitioner and the danger to the community that he poses, this Court does not seek to review under the arbitrary and capricious standard the decision of the INS to deny Hermanowski bail. Rather, these factors are considered only for the purpose of determining whether Hermanowski's continued detention is excessive in relation to those two factors recognized as the important governmental interests in detention. Whether the physical restriction can pass the substantive due process test can only be determined by examining the real weight of the government's concerns.

## F. Hermanowski's Substantive Due Process Claim

■ To determine whether Hermanowski's continued detention violates his right to substantive due process, this Court will follow a three step process. First, the Court will take measure of the specific conditions of Hermanowski's detention. Next, the Court will test the gravity of the government's concerns with Hermanowski's release. Finally, the Court will weigh the outcome of each analysis and judge whether the restrictions placed upon Hermanowski's liberty are excessive in light of the two important policy

**2.** Although the length of the detention is a factor that a court may consider in its due process analysis, this factor alone will rarely be determinative given the important governmental interests at stake. Courts that have examined certain pretrial detentions for due process violations have held that the length of

detention by itself is not a sufficient basis upon which to conclude that a detention offends the due process rights of the detainee. *See United States v. Orena*, 986 F.2d 628, 630–31 (2d Cir.1993); *United States v. Infelise*, 934 F.2d 103, 104 (7th Cir.1991).

objectives that detention pending deportation is designed to serve.

The federal government has held Hermanowski in detention since September 14, 1996, a period of more than twenty-eight months at the time of this writing. Although the length of detention alone will seldom trigger a violation of the detainee's due process rights, the duration of the restriction is an important factor in the due process analysis. For a man who has already paid his debt to society, twenty-eight months of incarceration in a state prison is not a trivial inconvenience; nor is the imprisonment made easier to bear with the knowledge that the detention is merely for regulatory purposes. In the real world beyond legal euphemisms, prison life, whether imposed for punitive or regulatory purposes, is a harsh existence. This detention strikes at the core of the liberty interest protected by the Fifth Amendment. *See Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Ingraham v. Wright*, 430 U.S. 651, 673–74, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ("While the contours of this historic liberty interest in the context of our federal system of government have not been defined precisely, they always have been thought to encompass freedom from bodily restraint and punishment."); *cf. Palko*, 302 U.S. at 327, 58 S.Ct. 149 ("Fundamental too in the concept of due process, and so in that of liberty, is the thought that condemnation shall be rendered only after trial.").

The uncertain duration of this incarceration compounds the inequity. Despite the best efforts of the INS, the State Department, and the American Embassy in Warsaw, the federal government has been unable during the last twenty-eight months to secure travel authorization for Hermanowski from the Polish government. Although the INS argues that such delays are not unheard of when dealing with convicted criminals, the agency offers no explanation for the delay whatsoever, no timetable for Hermanowski's eventual deportation, and no description of what efforts the federal government may employ in the future to secure what has been so elusive this far.

Significantly, the factual record before this Court contains the account of only one official act of the Polish government regarding Hermanowski's travel documents. It is also important to note that this fact is culled from an affidavit of an INS official submitted by the federal government. On December 19, 1996, the Polish government officially notified the United States government in writing that it would not allow Hermanowski's deportation to Poland. Nothing in the record indicates that this official position of the Polish government has changed. Although officials of the United States government have discussed Hermanowski's case with Polish officials since the December 19, 1996 decision, the INS does not even allege that the Polish government has officially indicated a willingness to modify its 1996 refusal.

Despite the clear import of Poland's December 19, 1996 communication to the Providence District Office, the INS characterizes Hermanowski's status with the Polish government as unresolved. This Court, however, has no evidentiary basis for concluding that the Polish government intends to reconsider its refusal. The INS would have this Court rely on the conjecture of INS employees for the proposition that someday, unknown diplomatic forces will convince unnamed Polish officials for unexplained reasons to reverse an official declaration of the Polish government that has now stood firm for over two years. This Court declines to take such a leap of faith.

Given the Polish government's official stance with regard to Hermanowski's travel documents, this Court has no basis to conclude that Hermanowski will be deported in the foreseeable future. Consequently, Hermanowski's detention is potentially

the equivalent of a life sentence in prison. Given the slim hope of deportation in the foreseeable future and the potential for many more years of detention while awaiting the occurrence of this remote possibility, the first three factors of the balancing test militate heavily in Hermanowski's favor. Next, the Court will address the weight of the two governmental interests at stake.

Detention pending deportation serves to protect the community from exposure to further criminal acts by an alien who has been convicted of an aggravated felony. In this case, detention would indeed advance that objective. However, the Court notes that under the circumstances of this case, the danger posed by Hermanowski is of the milder sort. Hermanowski has not made a career of committing violent felonies. Rather, his convictions are in the league of purse-snatching and low-level narcotics violations. While this Court does not make light of the seriousness of the crimes that Hermanowski has committed, his criminal career is typical of the petty thief who causes some consternation in his neighborhood, not of the more dangerous violent offender who we fear may wreak havoc in the community if set at large. Furthermore, the government's determination that an individual is a danger to the community is, by itself, an insufficient basis for detaining that individual indefinitely. *See Kansas v. Hendricks*, 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). The Supreme Court is hesitant to sanction civil detention based upon a finding of dangerousness alone, without an attendant justification that strengthens the case for such detention, such as a limited duration of detention, *see Salerno*, 481 U.S. at 747, 107 S.Ct. 2095 (pretrial detention), or a finding that the detainee is dangerous and unable to control himself, *see Hendricks*, 521 U.S. at 358, 117 S.Ct. 2072 (civil commitment of the mentally ill).

The second governmental objective in detention pending deportation, preventing the alien from absconding before deportation, can also be advanced in this case by restricting Hermanowski's freedom. However, as discussed above, given Poland's unequivocal rejection of Hermanowski's return to that country, there is little reason to believe that there will ever be a deportation to execute. Thus, this governmental objective loses much, if not all, of its force since its underlying purpose has vanished.

On balance, this Court concludes that continued physical detention of Hermanowski in a prison pending deportation is excessive in relation to the governmental objectives that regulatory detention seeks to advance. The crucial factor in this analysis, as the Magistrate Judge recognized, is the potential for deportation at some time in the foreseeable future. The only objective evidence before this Court on that point is the official denial issued by Poland in 1996 to the federal government's request for travel documents. The INS meekly counters this hard evidence with sketchy references to meetings between diplomatic officials and the unsubstantiated assertion that a reversal of Poland's position may someday be in the offing. This Court places little weight on the hopes of the INS. Rather, this Court values highly the one official statement of the Polish government on its willingness to accept Hermanowski. As far as that government is concerned, Hermanowski will not be allowed reentry into Poland.

The potential for deportation has been recognized by other federal courts as a key component in the calculus of substantive fairness. In the context of the indefinite detention of an excludable alien, a person who belongs to a class of aliens with fewer due process rights than the deportable alien in the case sub judice, the United States Court of Appeals for the Tenth Circuit declared that "there is no reason for [the alien's] continued incarceration other than the fact that no country has agreed to take him. That is insufficient reason to hold him further." *Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382,

1390 (10th Cir.1981); *see Zadvydas,* 986 F.Supp. at 1026–27 ("[O]nce it becomes evident that deportation is not realizable in the future, the continued detention of the alien loses its raison d'etre."); *see also Tam,* 14 F.Supp.2d at 1192; *Fernandez,* 505 F.Supp. at 799–800. As an administrative incident to deportation, detention is justified by its relationship to the ultimate goal of deporting the alien. As that goal becomes more and more unachievable, the justification for detention becomes more tenuous. In this case, the justification has been stretched too far. Detention of Hermanowski for over twenty-eight months with the promise of continued imprisonment for the rest of his life even though Poland has refused to allow deportation constitutes governmental conduct that "shocks the conscience" in violation of the Fifth Amendment to the United States Constitution.

Federal courts faced with comparable facts have reached similar results. In *Rodriguez–Fernandez,* the United States Court of Appeals for the Tenth Circuit determined that an excludable Cuban could not be held indefinitely after the Cuban government "consistently refused or failed to acknowledge" the United States government's request that the alien be returned to Cuba. *Rodriguez–Fernandez,* 654 F.2d at 1386. The *Rodriguez–Fernandez* Court compared detention pending deportation to incarceration pending trial and concluded that as such, it is "justifiable only as a necessary, temporary measure." *Id.* at 1387. This form of detention amounts to unconstitutional punishment when "imprisonment is for an indefinite period, continued beyond reasonable efforts to expel the alien." *Id.;* see *United States ex rel. Ross v. Wallis,* 279 F. 401, 403 (2d Cir.1922) ("[T]he right to deport does not include any right of indefinite imprisonment under the guise of awaiting an opportunity for deportation."); *Petition of Brooks,* 5 F.2d 238, 239 (D.Mass.1925) ("There is no power in this court or in any other tribunal in this country to hold indefinitely any sane citizen or alien in imprisonment, except as a punishment for crime.... He is entitled to be deported, or to have his freedom."); see also *Wolck v. Weedin,* 58 F.2d 928, 930–31 (9th Cir.1932); *Caranica v. Nagle,* 28 F.2d 955, 957 (9th Cir.1928); *United States ex rel. Kusman v. District Dir. of Immigration & Naturalization,* 117 F.Supp. 541, 547–48 (S.D.N.Y.1953); *United States ex rel Janavaris v. Nicolls,* 47 F.Supp. 201, 203 (D.Mass.1942); *In re Hanoff,* 39 F.Supp. 169, 171 (N.D.Cal. 1941).

Several federal district courts have also recently decided that indefinite detention may violate a deportable alien's due process rights. In *Zadvydas,* the United States government was unable to secure any nation's agreement to accept a deportable alien who was being held in federal custody. *See Zadvydas,* 986 F.Supp. at 1015. Because of the government's inability to deport the detainee, the *Zadvydas* Court concluded "that the petitioner's detention of nearly four years with no end in sight, and the probability of permanent confinement, is an excessive means of accomplishing the purposes sought to be served" by the INA. *Id.* at 1027. Likewise, in *Tam,* Vietnam refused to accept a deportable alien who had been held by the United States government for three years. *See Tam,* 14 F.Supp.2d at 1187. The district court, in concluding that release of the alien was compelled by the United States Constitution, explained that "[a]t some point, indefinite detention of a deportable alien caused by an unenforceable INS order must intersect with the Constitution." *Id.* at 1192. When it does, as in this case, the INS order of detention must give way.

Not all federal courts have concluded that potentially indefinite detention of an alien violates that alien's substantive due process rights. *See, e.g., Gisbert,* 988 F.2d at 1447 (denying the substantive due process claim of an excludable alien); *Tran,* 847 F.Supp. at 476 (denying the substan-

tive due process claim of a deportable alien). The *Tran* Court imported into the deportable alien context the *Gisbert* Court's analysis of the substantive due process rights of an excludable alien. *See Tran,* 847 F.Supp. at 476. Those courts held that even indefinite detention of an alien is not excessive in relation to the two governmental purposes that detention pending deportation serves. *See id.* The case sub judice can be distinguished on its facts from *Gisbert* and *Tran.* Poland has unequivocally refused Hermanowski's return to that country. Because the United States government has not produced competent evidence to the contrary, that decision of the Polish government transforms Hermanowski's indefinite detention into a permanent detention, as discussed above. Neither the *Gisbert* decision nor the *Tran* decision describes a similar evidentiary scenario that so strongly forecloses the possibility of effectuating deportation. However, to the extent that the *Gisbert* and *Tran* courts promote the notion that an alien's substantive due process rights can never be violated by detention pending deportation, this Court declines to follow those decisions and opts instead to ally itself with the better-reasoned decisions of the United States Court of Appeals for the Tenth Circuit in *Rodriguez–Fernandez* and the district courts in *Zadvydas* and *Tam.*

**G. Appropriate Relief**

Having determined that Hermanowski's continued detention violates his substantive due process right to be free from an arbitrary restraint on his liberty, this Court must craft an appropriate remedy. In habeas corpus proceedings, a federal district court has the authority to order the release of a person held in violation of his constitutional rights. *See Walters v. Reno,* 145 F.3d 1032, 1050–51 (9th Cir.1998) (upholding the authority of a district court to release improperly held aliens); *Tam,* 14 F.Supp.2d at 1189–90; *Zadvydas,* 986 F.Supp. at 1027–28. Such relief is necessary in this case to vindicate Hermanowski's constitutional rights. This case is factually similar to the situation faced by the district court in *Zadvydas.* Like *Zadvydas,* a proverbial "Man without a Country," Hermanowski cannot be deported because a foreign government has officially refused to accept him. More than two years of efforts by high-level officials of the United States government to reverse that decision have proven fruitless. The purpose underlying detention pending deportation has ceased to exist. So too must this offense upon Hermanowski's constitutional rights end. This Court is duty-bound to vindicate those rights and nothing short of release from federal detention will suffice. However, the Court can and will impose conditions on that release so that the important governmental objectives discussed above can be served.

### CONCLUSION

For the forgoing reasons respondents' motion to dismiss is denied and Hermanowski's Amended Petition for a Writ of Habeas Corpus will be granted with conditions. Petitioner, Matthew Hermanowski, will be released from the custody of the INS upon conditions to be set by the Court at a hearing to be scheduled by the Court for that purpose. Until then, no judgment shall enter. It is so ordered.