BRORBY, Circuit Judge,
dissenting.
I agree with the majority’s well-reasoned resolution of the threshold jurisdictional issue. I further agree the plain language of the applicable statutes, former 8 U.S.C. § 1226(e) (1994) and current 8 U.S.C. § 1231(a)(6), authorizes the Attorney General to detain Petitioners indefinitely pending execution of the final removal order. I must depart from the majority’s analysis at that point, however, because the indefinite detention of Petitioners Ho and Nguyen may well violate the substantive due process rights I believe the Fifth Amendment of the United States Constitution affords them, in a manner that shocks the conscience. For that reason, I would remand this matter to the district court for additional factual findings in accordance with the analysis presented below.
The majority avoid the crucial constitutional issue this case presents by preemptively concluding that Petitioners “fundamentally mischaracterize the true nature of the right they are asserting.” According to the majority, “[b]oth Petitioners are properly characterized as inadmissible aliens seeking temporary entry into the United States.” As shown, below, it is the majority, not the Petitioners, who mischar- *1061 acterize the fundamental rights at stake in this case.
Petitioners plainly assert that their continued, indefinite detention pending removal amounts to impermissible punishment and therefore violates the liberty rights they have as “persons” protected under the Due Process Clause of the Fifth Amendment to the United States Constitution. The majority disregard this claim, reasoning, without the support of authority, that “[t]he final removal orders stripped both Ho and Nguyen of any heightened constitutional status either may have possessed prior to the entry of the final removal order.” On that basis, the majority conclude “[t]he purported liberty interests at stake in these cases ... are most appropriately viewed from the perspective of an alien who has sought but been denied initial entry into this country and who is subject to indeterminate detention because his country of origin will not accept his return.” Narrowing its analysis to the perspective of an alien seeking initial admission to the United States, the majority permits our government to detain Petitioners indefinitely, even permanently, with no constitutional recourse (“ ‘an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application’ ” (quoting Landon v. Plasencia, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982))).
Close analysis reveals that the majority’s treatment of Petitioners’ constitutional claims is supported only by a tenuous foundation of legal fiction stacked upon legal fiction. In order to characterize Petitioners as aliens seeking admission, the majority must first equate the removal order itself with an actual physical exit from the country. Having made that leap, the majority adopt the “entry fiction” applied in admission cases so as to characterize immigrants who are physically present within United States borders pending a determination of admission as never having effected entry into this country and therefore not entitled to due process protection. See Plasencia, 459 U.S. at 32-33, 103 S.Ct. 321. Compounding these fictions is the majority’s unsupported conclusion that while Petitioners resided in the United States they may have enjoyed some form of “heightened” constitutional status that could be stripped away upon the issuance of a removal order. Finally, to avoid the constitutional prohibition against imprisonment for purposes other than punishment, the majority employs the fiction that detention is merely an extension of the exclusion proceedings, and therefore within the plenary power of the executive and legislative branches to govern immigration matters.
In my view, this fictional foundation the majority construct as a barrier to Petitioners’ constitutional claims collapses under the ground floor constitutional principal that “[wjhatever his status under the immigration laws, an alien is surely a ‘person’ in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as ‘persons’ guaranteed due process of law by the Fifth and Fourteenth Amendments.” Plyler v. Doe, 457 U.S. 202, 210, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); see also, Plasencia, 459 U.S. at 32, 103 S.Ct. 321 (“[o]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly”); Rodriguez-Fernandez, 654 F.2d at 1387-88 (“ ‘There is no power in this court or in any other tribunal in this country to hold indefinitely any sane citizen or alien in imprisonment, except as a punishment for crime.’ ” (quoting Petition of Brooks, 5 F.2d 238, 239 (D.Mass.1925))). Petitioners entered the United States as refugees in the 1980s and have lived in this country for over fifteen years. They have not exited the country and do not seek entry or readmission, temporary or otherwise. Thus, regardless of their status under the removal orders, in the most real *1062 sense Petitioners continue to be “persons” who enjoy basic constitutional rights.
Liberty is one of those basic rights enjoyed by all “persons,” as “[fjreedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause.” Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). Any infringement of this right, in the absence of incarceration pending trial or other disposition of a criminal charge (ie., punishment), is subject to strict scrutiny — the infringement must be “narrowly tailored to serve a compelling state interest.”[1] See Reno v. Flores, 507 U.S. 292, 301-02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); United States v. Salerno, 481 U.S. 739, 747, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The appropriate strict scrutiny analysis is set forth in Salerno, which instructs that we must first determine whether the detention is intended as punishment or for a legitimate regulatory purpose. If the detention is intended as legitimate regulation, we must determine whether it is “excessive in relation to the regulatory purpose Congress sought to achieve.” 481 U.S. at 747-48, 107 S.Ct. 2095.
The answer to the first question is clear. No one asserts Petitioners are being detained as punishment. Each has served his sentence(s) for the crime(s) committed. Furthermore, deportation and immigration detention are not considered punishment. See INS v. Lopez-Mendoza, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984); Zadvydas, 185 F.3d at 296; Phan, 56 F.Supp.2d at 1155 n. 7. We are therefore left to determine what regulatory purpose is being served and whether the detention is excessive in relation to that purpose.
As a number of district courts dealing with this difficult issue in the first instance have recognized, the critical inquiry in these cases is whether an alien’s detention is excessive in relation to the government’s legitimate regulatory interest in (1) ensuring the safe removal of aliens ordered deported; (2) preventing flight prior to deportation; and (3) protecting the public from dangerous felons. See Vo v. Greene, 63 F.Supp.2d 1278, 1282-83 (D.Colo.1999); Phan, 56 F.Supp.2d at 1155-56; Hermanowski v. Farquharson, 39 F.Supp.2d 148, 159 (D.R.I.1999); see also 8 U.S.C. § 1231(a)(6). In evaluating the scope of the detention in relation to the government’s regulatory interest,
we must necessarily balance the likelihood that the government will be able to effectuate deportation, against the dangerousness of a petitioner and the likelihood that he will abscond if released. In so doing, it becomes clear that as the probability that the government can actually deport an alien decreases, the government’s interest in detaining that alien becomes less compelling and the invasion into the alien’s liberty more severe. Dangerousness and flight risk are thus permissible considerations and may, in certain situations, warrant continued detention, but only if there is a realistic chance that an alien will be deported. Detention by the INS can be lawful only in aid of deportation. Thus, *1063 it is “excessive” to detain an alien indefinitely if deportation will never occur.
Phan, 56 F.Supp.2d at 1156.[2]
Because I do not accept the premise that Petitioners have no liberty rights at stake, I would apply this balancing framework to evaluate each Petitioner’s substantive due process claim.[3] The likelihood of deportation, dangerousness and the likelihood of flight clearly are factual inquiries unique to each case. The district court did not undertake such an inquiry, but instead relied on this court’s decision in.Rodriguez-Fernandez to grant the writs; As the majority point out, Rodriguez-Fernandez does not strictly control this case. Consequently, I would remand these matters to the district court to apply the balancing framework in the first instance, considering all facts relevant to evaluating the scope of detention in relation to the government’s legitimate regulatory purpose.
In sum, I emphasize that the sovereign power of the political branches of government to detain and remove aliens simply is not without limit — it must not run afoul of the Fifth Amendment’s guarantee that “[n]o person shall ... be deprived of life, liberty, or property, without due process of law.” U.S. Const. amend. V. The substantive component of this due process guarantee protects against governmental interference with those rights “implicit in the concept of ordered liberty,” Palko v. Connecticut, 302 U.S. 319, 324-25, 58 S.Ct. 149, 82 L.Ed. 288 (1937), and prohibits governmental conduct that “shocks the conscience.” Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). The majority cannot dispute that Petitioners Ho and Nguyen were “persons” under the Constitution for over fifteen years. Ordered liberty does not allow for the use of legal fictions to strip any human being of his status as a “person” under the United States Constitution in order to justify indefinite imprisonment pending completion of the regulatory process of removal. Governmental conduct that so reduces an individual to a “nonperson” to permit such imprisonment without any attempt to scrutinize the scope of the detention by balancing the likelihood that the government will be able to effectuate deportation against a petitioner’s dangerousness and the likelihood that he will abscond if released most assuredly shocks my conscience. I therefore dissent.

. I agree with the District Court for the Western District of Washington in its rejection of the government's argument that because the legislative and executive branches possess "plenary power” over immigration and naturalization, see Flores, 507 U.S. at 305-06, 113 S.Ct. 1439, courts should apply a more deferential standard of review. As that court noted:
While the plenary power doctrine supports judicial deference to the legislative and executive branches on substantive immigration matters, such deference does not extend to post-deportation order detention. Indefinite detention of aliens ordered deported is not a matter of immigration policy; it is only a means by which the government implements Congress's directives. The dangers at which the detention scheme is directed, chiefly the prevention of flight and the protection of the community pending deportation of aliens who have been convicted of crimes, involve domestic interests rather than international concerns.
Phan v. Reno, 56 F.Supp.2d 1149, 1155 (W.D.Wash.1999).

. This circuit and others have used similar balancing frameworks when reviewing other types of administrative detention. See, e.g., United States v. Theron, 782 F.2d 1510 (10th Cir.1986); United States v. Hare, 873 F.2d 796 (5th Cir.1989); United States v. Gelfuso, 838 F.2d 358 (9th Cir. 1988).

. I agree with that portion of the majority’s and Fifth Circuit's analysis that concludes there is no difference, under the circumstances presented here, between the right to release from continued incarceration asserted by an excludable versus a deportable alien, see Maj. Op. at 1058-59; Zadvydas, 185 F.3d at 294-96. Mr. Ho and Mr. Nguyen assert the same fundamental constitutional right, and the government’s interest in removing each is the same. See Zadvydas, 185 F.3d at 295. Courts which have found the distinction between deportable and excludable aliens relevant in this context, see Vo, 63 F.Supp.2d at 1282-83; Phan, 56 F.Supp.2d at 1153-54; Hermanowski, 39 F.Supp.2d at 157-58, appear to have done so as a means to avoid application of the entry fiction doctrine to deny constitutional rights to deportable aliens (i.e., aliens who once were lawful permanent residents). The strict scrutiny analysis I propose would eliminate the need for such a distinction in order to protect the constitutional rights of aliens who the United States government is unable to deport.